## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VANDA PHARMACEUTICALS INC.,
2200 Pennsylvania Avenue NW
Suite 300E
Washington, DC 20037,

                Plaintiff,

v.

FOOD AND DRUG ADMINISTRATION,
10903 New Hampshire Avenue
Silver Spring, MD 20993,

SARA BRENNER, M.D.,
in her official capacity as Acting
Commissioner of Food and Drugs,
10903 New Hampshire Avenue
Silver Spring, MD 20993,

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue SW
Washington, DC 20201,

and

ROBERT F. KENNEDY, JR.,
in his official capacity as
Secretary of Health and Human Services,
200 Independence Avenue SW
Washington, DC 20201,

                Defendants.

Civ. No. 25-cv-536

## COMPLAINT

Plaintiff Vanda Pharmaceuticals Inc. (Vanda) brings this complaint against the Food and

Drug Administration (FDA), the Department of Health and Human Services, Sara Brenner, and

Robert F. Kennedy, Jr., and alleges as follows:

## INTRODUCTION

1.    When it granted FDA the power to approve drugs before they can enter the market, Congress made clear that such a decision must happen with dispatch.  It erected a structure in which a drug would go from application to a judicially reviewable final agency decision in roughly 15 months—a timeframe that balances FDA's need to review complex data against the serious harms that occur when needed therapies languish in regulatory delay and innovators cannot timely recoup their investments.  But FDA does not follow Congress's timeframe.  Instead, FDA inter-poses extra-statutory processes and sets its own deadlines, which leaves applicants waiting years for action and effectively insulates FDA's decisions from judicial scrutiny.

2.    The Federal Food, Drug, and Cosmetic Act (FDCA) specifically imposes on FDA mandatory obligations to: (1) approve the application or issue a notice of an opportunity for a hearing within 180 days of the applicant's filing of the application (21 U.S.C. § 355(c)(1)); (2) commence a timely accepted hearing within 120 days of the notice—i.e., 300 days of the filing (*id.* § 355(c)(1)(B))); and (3) expedite the hearing and issue a final decision within 90 days of the final briefs (*id.*).

3.    A court in this District recently reminded FDA how these statutory deadlines for resolving new drug applications (NDA) operate.  *See Vanda Pharms. Inc. v. FDA*, 2024 WL 307387-CJN (D.D.C. Jan. 26, 2024).  Despite these instructions and Vanda's pending litigation on the same issues for its supplemental new drug application to market Hetlioz® tasimelteon to treat insomnia (*see Vanda Pharms. Inc. v. FDA*, No. 24-cv-351-ACR (D.D.C. 2024)), FDA has yet again unlawfully delayed another of Vanda's applications—and the stage is set for it to do so *again* on yet another.

4.    Despite the clear statutory text requiring FDA to act within 180 days of an NDA's filing, FDA has sought to substantially expand the time it has to respond, both by regulation and by a practice of disregarding the statutory deadline.  To start, FDA regulations artificially extend

the review period by allowing the agency 60 days at the beginning of the process to determine whether an application is even "filed." This regulation is unlawful. Then, after "filing" an application, FDA, by routine practice, simply disregards its statutory obligation to act on the application within 180 days. This, too, is unlawful. Indeed, a Court in this District has already determined that FDA's regulatory scheme "conflict[s] with the tighter statutory requirements." *Vanda Pharms.*, 2024 WL 307387 at \*4.

5.    Instead, FDA follows a non-statutory "goal" date that FDA selects for itself under the Prescription Drug User Fee Act (PDUFA)—a law that authorizes FDA to collect fees from drug companies and provides that those funds must be "dedicated toward expediting the review of human drug applications." *See* Pub. L. No. 102-571, 106 Stat. 4491 (1992); 21 U.S.C. § 379g note. FDA's performance "goal" under PDUFA for a standard NDA is to "[r]eview and act on 90 percent of [applications] within 10 months of the 60-day filing date." FDA, *PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2023 Through 2027* at 4 (last visited Feb. 10, 2025), https://www.fda.gov/media/151712/download. That is, FDA's own "goal" for responding to NDAs is a full year after FDA receives the application—*double* the amount of time mandated by Congress.[1]

6.    FDA effectively admits that it has no intention of following the statutory deadline for most NDAs, despite collecting more than $4,300,000 in fees for each new application requiring clinical data (regardless of the applicant's size)—an amount FDA *itself* set based on its own assessment of its "resource capacity needs" to review NDAs. *Prescription Drug User Fee Rates for Fiscal Year 2025*, 89 Fed. Reg. 61,474 (July 31, 2024). As another court in this District has already found, "with higher funds comes higher expectations," and given the additional funds available to

---

[1]    Although FDA phrases its goal as acting "within" those 12 months, FDA in fact designs its reviews to issue decision *on* the 12-month goal date.

FDA, the "unreasonableness in agency's delay comes sooner than it did prior to the PDUFA." *Sandoz, Inc. v. Leavitt*, 427 F. Supp. 2d 29, 40 (D.D.C. 2006).

7.    FDA's extra-statutory PDUFA goal dates unlawfully delay not just initial action on an NDA, but also the hearing to which the FDCA entitles an applicant if FDA will not approve the NDA as is.  Under Section 355(c)(1), a hearing must commence no more than *300 days* after the applicant files its application.  A "goal" to either grant an application or issue a notice of opportunity for a hearing within *365 days* necessarily violates the FDCA's hearing requirement in every case.

8.    FDA's conduct in this sphere is emblematic of an agency unused to meaningful judicial supervision.  Instead of honoring its statutory obligations, FDA has engineered a regulatory process rife with delay, in large part to avoid producing anything resembling a final agency action that would allow aggrieved parties to seek judicial review.  This is not unique to FDA's drug approval decisions, either.  For decades, FDA has eschewed rulemaking and formal adjudications in favor of "non-final" guidance and norms, preferring a system of its own design to the one Congress prescribed.[2]  But its employees treat these norms as law, which is effectively unchallengeable by a pool of regulated entities who cannot deviate from FDA's proposed course due to the size and scale of their investments in potential new therapeutics.  As one pharmaceutical general counsel recently remarked: "if the FDA says 'jump,' you ask, 'how high.'"  FDA employees, in turn, balk at the notion that regulated entities might challenge them.  Pharmaceutical companies—the quintessential repeat players before FDA—thus rightly worry that challenges to FDA

---

[2]    In a recent interview, for example, former FDA Acting Commissioner Dr. Janet Woodcock complained of recent and pending cases in which courts (including the Supreme Court of the United States) have given "less and less deference to agencies in general, and more attention in jurisprudence towards the literal meaning of the statutes."  Zachary Brennan, *Exit Interview: FDA Legend Janet Woodcock's Thoughts on the Agency and its Controversies*, Endpoints News (Jan. 29, 2024), endpts.com/qa-fda-legend-janet-woodcocks-thoughts-on-the-agency-and-its-controversies.

lawlessness will burn bridges with the regulators who will make crucial decisions on their applications.

9.    Vanda's latest innovation is tradipitant.  Tradipitant has been studied extensively for more than 20 years, first by Eli Lilly and, since 2012, by Vanda.  Tradipitant is a therapeutic agent that blocks the body's neurokinin 1 receptors; as such, it has the potential to treat a variety of conditions.

10.    This case concerns two new drug applications for tradipitant—one for tradipitant to treat symptoms of gastroparesis and one for tradipitant to prevent vomiting induced by motion.

11.    Vanda submitted its NDA No. 218489 for tradipitant to treat gastroparesis on September 18, 2023 (the gastroparesis NDA).  The NDA is the product of years of hard work, research, and development—including two double-blind, placebo-controlled clinical studies of adults with diabetic or idiopathic gastroparesis.  Vanda did not receive a notice of opportunity for a hearing until January 7, 2025—477 days later.  Vanda timely accepted its hearing on January 26, 2025.  Now, 522 days after Vanda first filed its application, FDA still has not scheduled a hearing.  Vanda's hearing is long past due—had FDA followed the statute, Vanda's hearing would have commenced on July 14, 2024, more than seven months ago.

12.    Vanda submitted NDA No. 220152 seeking approval of tradipitant capsules for the acute prevention of vomiting induced by motion in adults (i.e., motion sickness) (the motion sickness NDA) on December 30, 2024.  Those suffering from motion sickness experience severe nausea, dizziness, lightheadedness, and vomiting during or after travel.  Motion sickness can be debilitating, forcing those who suffer from it to abandon travel plans or forego certain activities when they lack an adequate treatment for their symptoms.

13.    FDA sent Vanda a letter acknowledging the NDA, noting the "date of application" and "date of receipt" as December 30, 2024.  FDA also informed Vanda that it would not "file" the application until February 28, 2025, relying on its 60-day filing regulation.  And as with

Vanda's many applications before this one, Vanda expects that, if the NDA is deemed filed, FDA will again inform Vanda that it intends to follow the user fee goal date under PDUFA and complete its initial review of Vanda's application within 10 months of the "filing date"—in other words, a year from when Vanda submitted the application and more than double the statutory timeframe under 21 U.S.C. § 355(c)(1).

14.    Under the FDCA's plain text, FDA's statutory deadline to respond to Vanda's motion sickness NDA, either by approving the application or issuing a notice of opportunity for a hearing (NOOH) is June 28, 2025.  FDA's proposed course of action here is unlawful. And its 60-day filing regulation, CRL regulations, and subordination of the statutorily mandated timeframe to PDUFA goals—which ensure such unlawful delay will recur in nearly every case—are also unlawful and should not be applied to Vanda.

15.    Vanda's ask in this case is simple: that FDA follow the law.  The Court should thus compel FDA to commence a hearing for Vanda's gastroparesis NDA immediately.  And it should further compel FDA to provide, no later than June 28, 2025, either an approval or a notice of opportunity for a hearing on Vanda's motion sickness NDA.  21 U.S.C. § 355(c)(1).  Finally, the Court should declare FDA's 60-day filing regulation, CRL regulation, and policy of following only PDUFA goals unlawful as contrary to the mandatory statutory deadlines set by Congress—at least as those policies and regulations are applied to Vanda.

**PARTIES**

16.    Plaintiff Vanda Pharmaceuticals Inc. is a global biopharmaceutical company focused on the development and commercialization of innovative therapies to address high-priority unmet medical needs and to improve the lives of patients.  Vanda is incorporated in Delaware and maintains its principal place of business in Washington, D.C.

17.    Defendant Food and Drug Administration is an agency of the United States government within the Department of Health and Human Services.  The Secretary of Health and

Human Services has delegated to FDA the authority to administer the relevant provisions of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* FDA is headquartered in Silver Spring, Maryland.

18.    Defendant Sara Brenner is Acting Commissioner of Food and Drugs. The Commissioner of Food and Drugs has delegated authority to administer the FDCA. She is sued in her official capacity only.

19.    Defendant Department of Health and Human Services (HHS) is a cabinet-level executive department charged with enhancing the health and well-being of all Americans. FDA is an agency of the United States government within HHS. HHS is headquartered in Washington, DC.

20.    Defendant Robert F. Kennedy Jr. is Secretary of Health and Human Services. He is the official charged by law with administering the FDCA. He is sued in his official capacity only.

## JURISDICTION AND VENUE

21.    Vanda brings this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201, the Mandamus Act, 28 U.S.C. § 1361, and the All Writs Act, 28 U.S.C. § 1651.

22.    This case arises under the laws of the United States. The court's jurisdiction is thus invoked under 28 U.S.C. § 1331.

23.    Venue is proper in this district under 28 U.S.C. § 1391(e) because Plaintiff Vanda resides in this district, and no real property is involved in this action.

## FACTUAL ALLEGATIONS

**A.    Statutory and regulatory background**

24.    The FDCA sets out a comprehensive scheme for federal government approval of newly developed drugs, and it prohibits the introduction into interstate commerce of any new drug absent approval of a new drug application (NDA).  *See* 21 U.S.C. § 355(a).

25.    The FDCA includes a mandatory timeframe for action on a drug manufacturer's NDA: "Within one hundred and eighty days after the filing of an [NDA], or such additional period as may be agreed upon by the [FDA] and the applicant, the [FDA] shall either—(A) approve the application… or (B) give the applicant notice of an opportunity for a hearing."  21 U.S.C. § 355(c)(1).

26.    And if FDA provides an NOOH (rather than an approval), an applicant may "elect to accept the opportunity for hearing by written request within thirty days after such notice."  *Id.* § 355(c)(1)(B).  A hearing then "shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree."  *Id.*  In other words, an accepted hearing must *commence* within 120 days of when FDA issues the NOOH.  Put together, then, FDA must commence a hearing on an NDA it will not approve within 300 days of the applicant filing it.

27.    Congress's careful attention to the timing of FDA's NDA review process does not end there.  The FDCA further mandates that any hearing must "be conducted on an expedited basis" and requires a final order to be "issued within ninety days after the date fixed by the Secretary for filing final briefs."  21 U.S.C. § 355(c)(1)(B).

28.    Thus, when drafting the statute, Congress envisioned a system in which FDA would regularly approve or disapprove drug applications (after a hearing on the record) within a reasonable time frame, and in so doing generate final, written decisions reviewable by courts.  21 U.S.C. § 355(c)(1).

8

### 1.    *FDA regulations and practices ensure routine violation of the 180-day deadline*

29.    Despite these clear statutory deadlines, FDA purports to extend its initial 180-day deadline by giving itself an additional 60 days at the beginning of the process to determine whether an application can be "filed." Instead of deeming an NDA or sNDA filed on the date it is submitted by the applicant, FDA deems NDAs filed "60 days after the date FDA received the NDA." 21 C.F.R. § 314.101. If FDA determines the application is complete enough to permit substantive review by the agency, *only then* does FDA start the 180-day clock. *See id.* § 314.101(a)(2) ("The date of filing will be the date 60 days after the date FDA received the NDA. The date of filing begins the 180–day period described in section 505(c) of the Federal Food, Drug, and Cosmetic Act.").

30.    Where FDA will not approve an application as filed, its regulations also extend the time FDA has to give the applicant its statutorily mandated NOOH on the backend, through its complete response letter (CRL) regulations. These regulations purport to suspend the 180-day deadline after the agency sends the applicant a CRL until the applicant takes one of a list of specified actions. 21 C.F.R. § 314.110(b)(1). And even if an applicant were to request an NOOH immediately, FDA's regulations give the agency an additional 60 days to provide it. *Id.* § 314.110(b)(3).

31.    FDA's regulations thus necessarily substitute the FDCA's mandatory deadline of 180 days with a process that is, at its absolute fastest, 240 days—but as a matter of practice drags on much longer.

32.    Indeed, FDA has adopted a routine practice of disregarding its statutory deadlines altogether. FDA regularly structures its review of new drug applications around an entirely different, and non-statutory, set of deadlines: the PDUFA goals. PDUFA authorizes FDA to collect fees from drug companies, and those funds in turn must be "dedicated toward expediting the review of human drug applications." *See* Prescription Drug User Fee Act of 1992, Pub. L. No. 102-

571, § 102, 106 Stat. 4491, 4491 (1992); 21 U.S.C. § 379g note.  This, too, allows FDA to subvert judicial review of its action by delaying action on the drug applications that FDA receives.

33.    FDA selects its own performance goals under PDUFA, which are communicated through letters it submits to Congress.

34.    FDA's performance "goal" under PDUFA for a standard NDA is to "[r]eview and act on 90 percent of [applications] within 10 months of the 60-day filing date."  FDA, PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2023 Through 2027 at 4 (as of May 15, 2024), perma.cc/FG94-7FDV.  That is, FDA's own "goal" for responding to NDAs is 365 days (10 months, plus 60 days from when the applicant submits the NDA)—or double the amount of time mandated by Congress.

35.    FDA's own reports confirm that it routinely takes longer than the statutorily mandated 180 days (roughly six months) to review applications—the median time to application approval for standard NDAs was 11.9 months in 2020 and 10 months in 2021.  FDA, Performance Report to Congress, Prescription Drug User Fee Act FY 2022 at 22 (as of May 15, 2024), perma.cc/VV3D-3WNW.  These delayed decisions are not the result of a backlog of applications that impedes FDA's ability to act faster.  To the contrary, FDA touts that it "exceeds" its PDUFA goals by approving more than 90% of applications by the PDUFA goal date.  *E.g.*, FDA, *Prescription Drug User Fee Act FY 2023, Performance Report to Congress* at 7, fda.gov/media/177976/download?attachment (noting 91%-100% performance meeting the PDUFA goals).

36.    Although FDA frames its "goals" as occurring "within" 12 months, it intentionally structures its review process so that the decision lands *on* the goal date.  FDA manuals instructing employees how to structure application reviews expressly structures reviews around the PDUFA goal date, with no consideration of statutory deadlines.  *See* Exhibit 1, FDA, *CDER 21st Century Review Process Desk Reference Guide* at 6 (as of July 11, 2023), perma.cc/NQ4F-G7GG (noting "Month 10" as the "action date" for applications).

37.    Notably, via PDUFA, FDA determines the fees that it will charge for each new application requiring clinical data.  21 U.S.C. § 379h.  The fee amount is set by statute, which accounts for a base fee amount based on the prior year, plus adjustments for inflation, strategic hiring and retention, capacity planning, and other cost adjustments for each fiscal year.  *Id.* § 379h(b).  Those adjustments include "changes in the resource capacity needs of the Secretary for the process for the review of human drug applications" (*id.* § 379h(c)(3))—effectively, drug manufacturers pay for the FDA's "resource capacity needs" necessary to review their drug applications.  For 2024, that application fee exceeded $4,300,000.  *Prescription Drug User Fee Rates for Fiscal Year 2025*, 89 Fed. Reg. 61,474 (July 31, 2024) (setting fee of $4,310,002 per application requiring clinical data).   Of course, if FDA believes that more than $4,300,000 per application is insufficient to satisfy its "resource capacity needs," FDA can raise its resource capacity needs that directly influence the fee amount.  Thus, FDA has significant control over the PDUFA fees that fund its NDA reviews and could increase that fee to ensure it could meet Congress's deadlines. FDA has instead chosen to routinely violate the FDCA.

38.    FDA's priority review voucher (PRV) program illustrates how the FDA has designed its programs to operate without regard to the statute.  Under the PRV program, sponsors with certain kinds of new drug applications (generally including drugs intended to address tropical diseases, rare pediatric diseases, and illnesses related to public health emergencies) can obtain a voucher that guarantees FDA will review a new drug application within 6 months—that is, the same 180 days the statute already requires.

39.    Once obtained from FDA for a fee of approximately $1.3 million (over and above the fee exceeding $4.3 million sponsors pay for the application itself), the voucher is transferrable and, if sold, can be redeemed by the new owner to obtain this expedited review for an entirely different drug (that is, one that would not itself qualify for a priority review voucher).  A report from the GAO indicated that PRV vouchers have sold at prices ranging from $67.5 to $350 million.

Gov't Accountability Office, supra, at 13-14 (Jan. 2020). Other recent reported sales of vouchers have been approximately $100 million. *E.g.*, Angus Liu, N*ovartis Buys FDA Priority Review Voucher from Bankrupt Mallinckrodt for $100M*, FiercePharma (July 1, 2022), perma.cc/MW76-Z7S8.

40.     The existence of this program—by which drug sponsors pay at least $1.3 million (if not much, much more) to receive the exact treatment the statute requires FDA to provide to all sponsors—reinforces the significant harm that FDA's routine delay inflicts on pharmaceutical in-novators. Drug developers will spend a hundred million dollars to purchase a voucher to secure the timeframe Congress mandated by statute. What is more, the fact that FDA will timely review an application if a priority review voucher is used confirms that FDA can achieve the statutory deadline when it chooses to do so.

## 2.     *FDA regulations and practices ensure routine violation of the 300-day hearing-commencement deadline*

41.     These routine violations of the 180-day deadline then compound to routinely pro-duce violations of the 300-day deadline to commence a hearing. Because NOOHs are never issued timely, a hearing definitionally cannot commence within 300 days of the application's filing.

42.     But, even after applicants finally receive an NOOH, FDA then layers in even *more* delay to the hearing-commencement timeline. To Vanda's knowledge, FDA has published only seven NOOHs on new drug applications since 2011 (including for the gastroparesis NDA at issue here). In each and every instance, FDA has injected significant additional delay and has not com-menced a formal hearing as required by the statute *in a single one.*

        (a.)     **ISTA**. In 2010, ISTA submitted an sNDA seeking approval to market a
        larger fill size of its approved drug Bromday (an ophthalmic solution for patients to use
        after undergoing cataract surgery). *See* Proposal to Refuse to Approve a Supplemental
        New Drug Application for Bromday (Bromfenac Ophthalmic Solution), 0.09%;

Opportunity for a Hearing, 76 Fed. Reg. 46,820 (Aug. 3, 2011).  After CDER issued a complete response letter, ISTA requested an opportunity for a hearing following 21 C.F.R. § 314.110(b)(3).  *Id.* at 46,821.  FDA issued a private NOOH on July 11, 2011 (Ltr. Re: Proposal to Refuse Marketing Approval; Notice of Opportunity for a Hearing, Docket No. FDA-2011-N-0513 (Jul. 11, 2011)[3]), and published the NOOH on August 3, 2011 (76 Fed. Reg. at 46,820).  CDER and ISTA then went back and forth for almost a year on whether to hold a hearing, and if so, when it should commence.  *See generally* Docket, Proposal to Refuse to Approve a Supplemental New Drug Application for Bromday (Bromfenac Oph-thalmic Solution), 0.09%; Opportunity for a Hearing, FDA-2011-N-0513, https://regula-tions.gov/docket/FDA-2011-N-0513/.  FDA did not hold a hearing.

(b.)    **PMRS**. In 2017, PMRS submitted an NDA for a particular type of oxyco-done oral capsule with claimed abuse deterrent properties.  *See* Proposal To Refuse To Approve a New Drug Application for Oxycodone Hydrochloride Immediate-Release Oral Capsules, 5 Milligrams, 15 Milligrams, and 30 Milligrams; Opportunity for a Hearing, 83 Fed. Reg. 6,196 (Feb. 13, 2018).  After receiving a complete response letter, PMRS re-quested an opportunity for a hearing following 21 C.F.R. § 314.110(b)(3).  *Id.* at 6,196. FDA issued a private NOOH on January 16, 2018 (Ltr. Re: Proposal to Refuse to Approve a New Drug Application for Oxycodone Hydrochloride Immediate-Release Oral Capsules; Opportunity for a Hearing (Jan. 16, 2018[4])), and published the NOOH in the Federal Reg-ister on February 13, 2018 (83 Fed. Reg. 6,196).  CDER sent a proposed order denying a hearing on June 13, 2018 (Ltr. Re: Proposed Order (June 13, 2018)[5])—the date that a

---

[3]    Available at https://www.regulations.gov/document/FDA-2011-N-0513-0001.

[4]    Available at https://www.regulations.gov/document/FDA-2018-N-0188-0002.

[5]    Available at https://www.regulations.gov/document/FDA-2018-N-0188-0275.

hearing should have *commenced* under the statute, if counting from the (late) NOOH publication. By September 2018, no hearing had been scheduled, prompting PMRS to file suit to compel a response. *See* Complaint, *Pharmaceutical Manufacturing Research Services, Inc. v. U.S. Food & Drug Admin.*, No. 2:18-cv-03917-GJP (E.D. Pa. Sept. 12, 2018), ECF No. 1. FDA then published a final order denying a hearing and refusing the NDA on October 30, 2018.

(c.) **Lexicon.** In 2018, Sanofi-Aventis U.S. LLC submitted an NDA for oral tablets for sotagliflozin. After FDA issued a complete response letter in March 2019 and Sanofi transferred the NDA to Lexicon, Lexicon requested an opportunity for a hearing under 21 U.S.C. § 314.110(b)(3) on November 10, 2020. *See* Proposal to Refuse to Approve a New Drug Application for Sotagliflozin Oral Tablets, 200 Milligrams and 400 Milligrams, Opportunity for a Hearing, 86 Fed. Reg. 12,471 (March 3, 2021). Although FDA's private NOOH (if any) does not appear on the docket, FDA did not publish the NOOH until March 3, 2021—more than four months after Lexicon's request.[6] Lexicon accepted the hearing opportunity on March 5, 2021. But FDA failed to act until Lexicon sent a letter on July 19, 2021—two days after the hearing should have commenced, if counting from the date of the published NOOH. The parties then agreed to an abeyance while CDER and Lexicon discussed the NDA. Request for Abeyance from FDA CDER, Docket No. FDA-2021-N-0208-0075 (Aug. 10, 2021). In January 2022, Lexicon reminded the agency that it still had not granted or denied its request and repeated its request for a hearing on its NDA. CDER then took *six more months* to file its proposed order recommending the denial of a hearing. *See* CDER Proposed Order, Docket No. FDA-2021-N-

---

[6]   FDA regulations require FDA to send a notice of opportunity for a hearing within 60 days of the request (21 C.F.R. § 314.110(b)(3)). If following its ordinary practice, FDA would have sent a private NOOH on January 9, 2021—and it then delayed publication another 53 days.

209-0087 (June 30, 2022). CDER and Lexicon completed briefing on summary judgment in January 2023—but the Commissioner did not act on the request for eight months. At that point, in August 22, 2023, Lexicon and CDER jointly requested abeyance. Just last week, on February 14, 2025, Lexicon withdrew its agreement for abeyance and requested that the hearing process resume. Letter Request for Resumption of Hearing Process, Docket No. FDA-2021-N-0208-0105 (Feb. 14, 2025).

(d.) **Intarcia.** In 2016, Intarcia submitted an NDA for ITCA 650, a drug-device combination for delivering a GLP-1 receptor agonist. After FDA issued a complete response letter in 2017 and internal appeals and resubmission failed, Intarcia requested an opportunity for a hearing on March 16, 2021 following 21 C.F.R. § 314.110(b)(3). *See* Proposal To Refuse To Approve a New Drug Application for ITCA 650 (Exenatide in DUROS Device); Opportunity for a Hearing, 86 Fed. Reg. 49,334 (Sept. 2, 2021). Although FDA's private NOOH (if any) does not appear on the docket, FDA did not publish the NOOH until September 2, 2021—nearly six months after Lexicon's request.[7] After Intarcia timely accepted its hearing opportunity, FDA did not timely act. A hearing should have commenced by December 31, 2021, if counting from the published NOOH, but none did. The parties conferred in March 2022, but could not reach agreement on a schedule for the proceedings because CDER refused to submit a proposed order any "earlier than July 29, 2022." Letter re: Intarcia Therapeutics, Inc. Hearing Request for NDA 209053 ITCA 650 (exenatide in DUROS device), Docket No. FDA-2021-N-0874-0055 (Mar. 22, 2022). Indeed, CDER even took the position that it has *no deadline* to submit its proposed order as to whether a hearing should be granted or denied (*id.*), despite the fact that the statute

---

[7] FDA regulations require FDA to send a notice of opportunity for a hearing within 60 days of the request (21 C.F.R. § 314.110(b)(3)). If following its ordinary practice, FDA would have sent a private NOOH on May 15, 2021—and it then delayed publication another 110 days.

and regulation both require FDA to commence a hearing, if one is to be had, 120 days after the NOOH.  Rather than hold a hearing, FDA referred the matter to an advisory committee for an informal hearing under 21 C.F.R. § 12.32, and the matter was finally resolved with a final decision denying a hearing and denying the NDA on August 23, 2024.  *See* Final Decision on the Proposal To Refuse To Approve a New Drug Application for ITCA 650, 89 Fed. Reg. 68,168 (Aug. 23, 2024).

(e.)    **Vanda/jet lag**.  On October 16, 2018, Vanda filed an sNDA with FDA seeking approval to market its drug Hetlioz® for the treatment of jet lag disorder.  304 days later, FDA issued a complete response letter.  After attempting to assuage the agency's concerns through internal administrative appeals, Vanda formally requested an opportunity for a hearing on July 1, 2022.  Despite delivering an NOOH to Vanda privately on August 26, 2022, FDA did not publish the NOOH in the federal register until October 11, 2022. *See* Proposal To Refuse To Approve a New Drug Application Supplement for HETLIOZ (Tasimelteon); Opportunity for a Hearing, 87 Fed. Reg. 61,337 (Oct. 11, 2022).  Vanda timely accepted the opportunity for a hearing within 30 days of both the private and public notice, but FDA did not schedule a hearing.  Instead, it took another eight months for CDER to issue a proposed order denying a hearing, followed by three more months of summary judgment briefing.  Another five months later—after being ordered by a court to issue a decision (2024 WL 307387, at *6)—FDA denied Vanda a hearing.

(f.)    **Vanda/insomnia**.  Vanda submitted an sNDA on May 4, 2023, seeking approval to market Hetlioz® to treat insomnia.  FDA did not take any action on the application within the 180-day statutory deadline.  Instead, on March 4, 2024—245 days after Vanda submitted its application—FDA issued a complete response letter.  In two separate letters to the agency, Vanda made clear that it did not consent to any further delay and insisted that FDA follow its statutory obligations.  In response to pending litigation seeking to

16

compel FDA to act timely (*see Vanda Pharms. Inc. v. FDA*, No. 24-cv-351), FDA published an NOOH on June 7, 2024—400 days after Vanda submitted its sNDA and well after both its 180-day deadline to issue the notice and its 300-day hearing deadline.  *See* Proposal to Refuse to Approve a New Drug Application Supplement for HETLIOZ (Tasimelteon); Opportunity for a Hearing, 89 Fed. Reg. 48,647 (June 7, 2024).  Vanda accepted its hearing opportunity on July 3, 2024, but FDA has again required Vanda to partake in protracted summary judgment proceedings.  It has not scheduled a hearing.[8]

(g.)    **Vanda/gastroparesis**.  Vanda is facing similar egregious delays for its NDA for tradipitant to treat gastroparesis—at issue in this case.  Vanda submitted its application on September 18, 2023.  FDA took no action for a full year, ultimately issuing a complete response letter on September 18, 2024.  Again, FDA issued the CRL well past both its 180-day NOOH and 300-day hearing deadlines.  FDA did not issue Vanda's private NOOH for another four months—on January 7, 2025—and did not publish the NOOH until January 16, 2025.  *See* Proposal to Refuse to Approve a New Drug Application for TRADIPITANT; Opportunity for a Hearing, 90 Fed. Reg. 4,749 (Jan. 16, 2025).  Although Vanda timely accepted its opportunity for a hearing, FDA has not scheduled a hearing.

43.    Each of these examples illustrates the extreme delays that FDA injects into the statutory timeframe, by regulation and by policy or practice.  And each case illustrates FDA's continued efforts to impede access to judicial review of its decisions.

44.    *First*, FDA regulations inject delay because the agency treats a *private* NOOH as satisfying the statutory NOOH obligation, but FDA regulations require the NOOH to be *published*

---

[8]    During a January 29, 2025, conference with the Court, Vanda again requested that FDA commence a hearing.  The Court ordered the parties to file a joint status report on February 19, 2025, if the request is denied.  *See* Minute Order, No. 24-cv-351-ACR (Jan. 29, 2025).  Despite repeated inquiries, Vanda has not received a response from FDA.

in the Federal Register to trigger the hearing processes.  21 C.F.R. § 314.200(a)(2), (c)(1)(i); *see Vanda Pharms.*, 2024 WL 307387, at *2, *4.  The delay between the private NOOH and published NOOH was 23 days for ISTA; 28 days for PMRS; and 46 days for Vanda/jet lag.  On information and belief—and based on FDA regulations requiring an NOOH within 60 days of a hearing request—the delay between the private NOOH and published NOOH was 53 days for Lexicon and 110 days for Intarcia. *See supra* notes 6, 7.

45.    FDA began reducing this delay only after Vanda requested judicial intervention with respect to its jet lag disorder sNDA.  There, Judge Nichols held that FDA's regulation "treating the date of public notice as the relevant date for analysis" is contrary to statute, and he concluded that the hearing clock must instead start as soon as FDA provides an applicant private notice. *See Vanda Pharms.*, 2024 WL 307387, at 4.

46.    For the gastroparesis NDA at issue in this case, FDA delayed seven days between the sending of a private NOOH and publication of the NOOH.[9]

47.    *Second*, rather than granting a hearing when an applicant requests one, FDA engages in a summary judgment procedure about *whether* to grant a hearing that takes months or years.  It begins 60 days after the publication of the NOOH, when the applicant must submit "the studies on which the person relies to justify a hearing" as well as "a factual analysis of all the studies submitted."  21 C.F.R. § 314.200 (c)(1), (d).  Then, CDER will "prepare an analysis of the request and a proposed order ruling on the matter," either proposing a denial or granting a hearing on all of some of the issues on which a hearing is requested.  *Id.* § 314.200(f).  If CDER

---

[9]    FDA only delayed a day between the private NOOH and published NOOH for Vanda's insomnia sNDA—because it did so to moot pending litigation. *See* FDA Mem. Opp. 14, No. 24-cv-351 (ACR) (July 8, 2024), ECF No. 17.  But this shows clearly that FDA *can* act more quickly; it just chooses not to do so.

recommends denying a hearing, the agency undertakes a "separation of functions" within the agency to separate CDER staff and the Office of the Commissioner. *Id.*

48.    After the separation of functions, CDER serves a proposed order denying a hearing on the applicant, after which the applicant has another 60 days to "respond with sufficient data, information, and analyses to demonstrate that there is a genuine and substantial issue of fact which justifies a hearing." *Id.* § 314.200(g)(2), (3).  The Commissioner "will grant a hearing if there exists a genuine and substantial issue of fact or if the Commissioner concludes that a hearing would otherwise be in the public interest." *Id.* § 314.200(g)(6).

49.    Curiously, FDA's regulations state that, if a hearing is granted, "it will begin within 90 days after the expiration of time for requesting a hearing" (21 C.F.R. § 314.200(g)(5))—the same as the statute (21 C.F.R. § 355(c)(1)).  But FDA has erected a cumbersome summary judgment procedure that prevents the agency from ever timely commencing a hearing within the statutory or regulatory 90 days—and, unsurprisingly, FDA has not granted such a hearing on an NDA going back at least to 2011 (and likely longer).

50.    For example, after FDA published ISTA's NOOH on August 3, 2011, the Office of the Commissioner (OC) took three months (until November 7) to issue a letter proposing a schedule for summary judgment proceedings on whether to grant ISTA a hearing at all.  Letter from FDA OC to ISTA Pharmaceuticals, Inc. (Covington & Burling LLP) and Staff Attorney, Docket No. FDA-2011-N-0513-0007 (Nov. 7, 2011).  That schedule proposed that CDER would file its response recommending that the Commissioner grant or deny a hearing by November 30, and that ISTA would have 60 days to respond.  *Id*.  In response, ISTA maintained that it was entitled to a hearing that began on December 1, 2011, or 120 days after the NOOH, but nevertheless agreed to negotiate a hearing schedule.  CDER, however, requested that OC should defer acting on ISTA's hearing request until after an advisory committee meeting on Dermatologic and Ophthalmic Drugs, which was scheduled for February 27, 2012.  Letter from FDA/CDER to Margaret A. Hamburg,

M.D., Commissioner of FDA, Docket No. FDA-2011-N-0513-0008 (Nov. 30, 2011). CDER re-peatedly asked for an extension until after the advisory committee to simply provide its position to the Commissioner on whether to grant a hearing. CDER and ISTA eventually agreed to meet and discuss the sNDA on April 5, 2012—*246 days* after the NOOH was published, and 126 days past when a hearing should have commenced. Although unclear how FDA and ISTA eventually resolved the matter, a hearing was never held.

51.    Similarly, with Intarcia, FDA waited months (from November 2021 to March 2022) to begin addressing a potential schedule for the proceedings, and then CDER requested another six months to prepare its proposed order on Intarcia's request. The Commissioner granted CDER's requested timeline on April 15, 2022. Letter from G. Matthew Warren, Docket No. FDA-2021-N-0874-0057 (Apr. 15, 2022). Intarcia timely responded to CDER's proposed order on October 10, 2022. Then, even though the Commissioner "identified numerous disputes between the par-ties" with respect to the NDA, the Commissioner *still* did not grant a hearing, instead offering Intarcia the chance to refer the matter to an advisory committee, but in exchange for continued delay. Letter from FDA OC to Hogan Lovells LLP and FDA CDER, Docket No. FDA-2021-N-0874-0066 (Feb. 7, 2023) (offering to conduct the advisory committee hearing within another 120 days). Intarcia accepted the Commissioner's alternative offer for an advisory committee hearing on February 23, 2023, almost two years after Intarcia requested the NOOH in the first place.

52.    These examples illustrate that FDA has a clear policy of not holding hearings. FDA has not commenced a hearing in a single one of these seven cases, either granting itself summary judgment without a hearing or otherwise offering the applicant alternative mechanisms to resolve the dispute short of a hearing.

53.    This practice is not simply a problem of delay to get to a hearing—although FDA's delays are astounding. FDA's practice of adding additional layers at each step of the process and injecting delay into each one makes it nearly impossible to reach a final conclusion to the agency's

review process with a final decision that is subject to judicial review.  And, by insulating itself

from judicial review, FDA can then perpetuate its abuses of authority against pharmaceutical com-

panies that have no meaningful path other than to comply with FDA's unlawful directives.

**B.    Factual background**

54.    Vanda develops and markets innovative pharmaceutical products to address high-

impact unmet patient needs.

55.    In 2012, Vanda licensed tradipitant, a novel neurokinin-1 (NK-1) antagonist, from

Eli Lilly and Company.  Although not yet approved for any indication in the United States, tradip-

itant has been studied extensively since 2003.  And in 2016, Vanda began studying tradipitant's

safety and efficacy for multiple indications, including for the acute prevention of vomiting induced

by motion (motion sickness) and as a treatment for symptoms of gastroparesis, a serious digestive

disorder.

*1.    Tradipitant as a treatment for gastroparesis symptoms*

56.    Tradipitant has the potential to transform the lives of patients suffering gastropare-

sis by alleviating the debilitating effects of chronic nausea, vomiting, bloating, and abdominal

pain.  Tradipitant would be the *first* FDA-approved therapy to treat idiopathic gastroparesis. And

while FDA has approved one other drug to treat diabetic gastroparesis—Reglan (metoclo-

pramide)—it carries risk of serious adverse side effects, including tardive dyskinesia (a chronic,

drug-induced movement disorder).  Indeed, FDA currently cautions against using Reglan for more

than 12 weeks, leaving even those suffering diabetic gastroparesis out of consistent, long-term

treatment options.

57.    Vanda submitted its tradipitant NDA (NDA No. 218489) on September 18, 2023.

FDA deemed the NDA filed on November 17, 2023.  *See* 21 C.F.R. § 314.101(a) (providing that

NDAs are deemed filed "60 days after the date FDA received the NDA").

58.     With its NDA, Vanda submitted substantial evidence of tradipitant's safety and its efficacy to treat symptoms of gastroparesis.  Specifically, Vanda supplied the results of two large adequate and well-controlled studies, both of which were double-blind and placebo-controlled in adults suffering both diabetic and idiopathic gastroparesis experiencing moderate to severe symptoms in the study populations.  In the first study, Study 2301, tradipitant showed statistically significant improvement compared to placebo for change in daily average nausea score, and tradipitant significantly improved the percentage of nausea-free days and endpoints measuring overall disease severity.  The second study's result, Study 3301, numerically favored tradipitant, consistent with Study 2301.  Two clinicians and leading researchers in treating gastroparesis, Dr. Michael Camilleri and Dr. Thomas L. Abel, submitted declarations in support of Vanda's NDA, explaining their opinions that Vanda's studies demonstrated tradipitant's efficacy in treating gastroparesis.

59.     In addition to its clinical studies, Vanda supplied additional confirmatory evidence of tradipitant's efficacy.  For example, a pooled study of patients in Studies 2301 and 3301 over 3 weeks showed statistically significant improvement in the primary endpoint of change of nausea severity from baseline as well as across a number of measures of disease severity.  And an open-label arm of Study 3301 that enrolled 389 patients showed significant improvement from baseline in subjects' average nausea score and overall gastroparesis symptoms.

60.     Tradipitant has also been shown to be safe to use.  Tradipitant has been studied in 14 preclinical studies in both rodent and non-rodent species, in a total of 3,669 animals.  The findings from these studies—which involved dosing of the drug at concentrations many times higher than would ever be used in humans—did not reveal any clinical, laboratory, or pathology evidence of target organ toxicity.  Tradipitant has also been studied in humans in 11 Phase 1 studies, 8 Phase 2 studies, 3 double-blind Phase 3 studies, 1 open-label expanded access Phase 3 study, and the open-label portion of 1 ongoing Phase 3 study, in patients and healthy volunteers aged 18

to 75.  In combination, more than 2,300 individuals have been exposed to tradipitant, and more than 900 of those patients for more than eight weeks, and some for longer than a year.  The drug has shown a favorable tolerability profile, with the most common side effects (in less than 10% of the population) being fatigue and sleepiness.  No significant safety findings were reported in any of these trials.  Nor did any significant safety concerns emerge during Vanda's own studies.

61.     In its NDA cover letter, Vanda specifically emphasized the agency's 180-day obligation: "Vanda expects FDA to complete review of this application within 180 days of its filing in accord with 21 U.S.C. § 355(c)(1), at which point Vanda expects either approval or notice of an opportunity of a hearing before the Commissioner."

62.     FDA did not adhere to the statutory timeline.  Despite Vanda submitting the application on September 18, 2023, FDA did not issue an NOOH until January 7, 2025—*477 days later*.

63.     The delay stems in part from FDA's decision to issue a complete response letter on September 18, 2024—its PDUFA goal date—instead of the NOOH required by statute.  In letters dated November 8, 2024, and November 21, 2024, Vanda twice reminded FDA of its statutory obligation to provide the NOOH timely, noting that the notice was already by that time long overdue and making clear that Vanda did not consent to further delay.  Yet the agency still withheld the NOOH for several months.

64.     After the NOOH finally issued on January 7, Vanda formally accepted its hearing on January 26, 2025.  But, by statute, a hearing should have commenced by July 15, 2024.  To date, FDA has yet to put a hearing on the calendar and is poised to again engage in a months-long summary judgment procedure that will only further delay Vanda's statutorily mandated hearing.

### 2.    *Tradipitant to prevent motion sickness*

65.     Vanda has also developed tradipitant as an innovative preventative therapy for motion sickness.  Although motion sickness can affect anyone, it has long been of particular interest for national security reasons given the need to rapidly deploy troops under various different

transport conditions. Indeed, U.S. military research in the 1940s developed the motion sickness treatments available today. But currently available treatments leave much to be desired. Dramamine, for instance, is often associated with significant and unpleasant side effects, including drowsiness, constipation, and blurred vision. Motion sickness sufferers are eager for new options.

66.    Vanda began studying tradipitant for the prevention of motion sickness with a Phase 2 study (VLY-686-2401), the results of which indicated a significant improvement over placebo in the number of incidents of vomiting due to motion sickness.

67.    In 2021, Vanda conducted a larger, blinded, placebo-controlled Phase 3 trial to assess the efficacy of tradipitant (Study VLY-686-3401), which showed significant improvements in incidents of vomiting over placebo. In 2024, Vanda finished a second, blinded, placebo-controlled Phase 3 trial (Study VLY-686-3404). Vanda is also conducting an ongoing open-label study of tradipitant for motion sickness to assess the drug's safety and tolerability (Study VLY-686-3403).

68.    Vanda submitted this substantial evidence of tradipitant's safety and efficacy to treat vomiting induced by motion in adults in its NDA. To show efficacy, Vanda supplied the results of the three adequate and well-controlled studies in adults with a history of motion sickness, described above, each of which was randomized, double-blind, and placebo controlled. The first study, Study 2401, showed significant improvement with tradipitant. For the co-primary endpoint measuring the percentage of participants who vomited during vehicle travel, the percentage was significantly lower in patients who received tradipitant (17.5%) compared with placebo (39.7%), reducing the risk of vomiting by 57%. The other co-primary endpoint, the Motion Sickness Severity Scale (MSSS), also favored tradipitant, with lower MSSS worst scores in the tradipitant group than in the placebo group.

69.    Vanda's second study, Study 3401, was a Phase 3 study with a primary efficacy endpoint of the percentage of participants who vomited during vehicle travel. Results strongly

favored tradipitant, with patients experiencing reduced risk of vomiting by either 56% or 58%, depending on the dose of tradipitant.  Vanda saw similar results when considering incidences of vomiting in board rides with wave heights over or equal to 1 meter (59% or 57%, dose dependent), as well as vomiting more than once during vehicle travel (65% or 56%, dose dependent).  Vanda's second Phase 3 study, Study 3404, achieved similar results for the same endpoints as Study 3401. It further showed strong results on its key secondary endpoint of prevention of severe nausea and vomiting, with only 9.4% (170 mg) and 17.3% (85 mg) of tradipitant takers experiencing severe nausea and vomiting relative to 33% of the placebo group.

70.    Vanda submitted its NDA for tradipitant capsules for the proposed indication of the acute prevention of vomiting induced by motion in adults on December 30, 2024.  By letter dated January 22, 2025, FDA acknowledged Vanda's NDA, noting the "date of application" and "date of receipt" as December 30, 2024.  But relying on its 60-day filing regulation, it informed Vanda that it would not "file" the application until February 28, 2025, if it deems the application sufficiently complete.

71.    Vanda responded on February 4, 2025, objecting to FDA's application of the 60-day filing regulation and insisting that FDA follow the FDCA's express timeframe for reviewing NDAs.

72.    FDA has not responded to Vanda's communication as of the date of this filing.

**C.    FDA's actions are unlawful.**

73.    By statute, FDA must act on an NDA by either approving the application or publishing a notice of opportunity for a hearing within 180 days.  The FDCA unambiguously provides that "[w]ithin one hundred and eighty days after the filing of an application … , the Secretary *shall* either … (A) approve the application … or (B) give the applicant notice of an opportunity for a hearing before the Secretary under subsection (d) on the question whether such application is approvable."  21 U.S.C. § 355(c)(1) (emphasis added).  The only exception to the 180-day deadline

is where an "additional period" is "agreed upon by the Secretary and the applicant." *Id.* From there, the statute is clear that a hearing "shall commence" not more than 120 after the NOOH issues, so long as the applicant timely accepts the notice. *Id.*

74.     The word "'shall' is 'mandatory'" and "usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171-172 (2016) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)). In particular, "[w]hen a statute distinguishes between 'may' and 'shall'"—as Section 355 frequently does—"it is generally clear that 'shall' imposes a mandatory duty." *Id.* at 172; *see also Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) (statutory term "shall" is "mandatory language" that "typically creates an obligation impervious to discretion") (quotation marks omitted, alteration incorporated).

75.     A court in this District has previously held that the FDCA's "180-day statutory provision imposes a mandatory obligation on the FDA," and as such, FDA "is required to take action on [an applicant's] NDA within 180 days of its filing." *Sandoz, Inc.*, 427 F. Supp. 2d at 33-38; *see also id.* at 34 (rejecting FDA's argument that PDUFA rendered the 180-day deadline "aspirational rather than mandatory"); *In re Barr Lab'ys, Inc*., 930 F.2d 72, 74 (D.C. Cir. 1991) (concluding identical statutory language in § 355(j)(5)(A) to be a "facially mandatory statutory deadline"). And where "FDA's regulations conflict with the tighter statutory requirements," they are "void." *Vanda Pharms.*, 2024 WL 307387, at *4 (quoting *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009)).

### 1.     *PDUFA does not authorize FDA to disregard the FDCA's deadline to act.*

76.     Despite the FDCA's clear statutory deadlines, in practice, FDA processes applications in line with its self-selected goals under the Prescription Drug User Fee Act of 1992 (PDUFA), which are often much longer. But PDUFA did not impliedly repeal or otherwise alter the FDCA's 180-day timeline to review an application or its 300-day timeline to commence a hearing.

77.     PDUFA was enacted as a congressional response to FDA's systematic failure to comply with Section 355(c)(1).  In the early 1990s, FDA's delays in acting on drug applications were abysmal.  The agency took "an average of 20 months"—more than 600 days—"from the time an application to market a new drug is submitted, to reach a decision on the application."  H.R. Rep. No. 102-895, at *9 (Sept. 22, 1992).  "Even in the FDA's view, the delays [were] severe." *In re Barr Lab'ys*, 930 F.2d at 74.  But rather than modify FDA's obligation to act within 180 days, Congress gave FDA more resources.  That is, although "Congress recognized the FDA's inability to meet the statutory deadline[,] … in response, [it] took no direction to modify the 180-day action window but instead created a program, the PDUFA, to boost FDA's resources." *Sandoz*, 427 F. Supp. 2d at 37 (citing 21 U.S.C. § 379g).  Thus, PDUFA represents a funding mechanism enacted by Congress to help *reduce* FDA's violations of its statutory deadlines, not to override them.

78.     Over the years, Congress has reauthorized the funding mechanism.  FDA has continued to send letters with its "goals" to Congress, and Congress has reauthorized the agency to collect user fees expressly dedicated to expediting review. *See*, *e.g.*, PDUFA VII, Pub. L. No. 117-180, tit. I, § 1001(b), 135 Stat. 2140 ("Congress finds that the fees authorized by the amendments made by this title will be dedicated toward expediting the drug development process and the process for the review of human drug applications … as set forth in the goals identified … in the letters from the Secretary of Health and Human Services … .").  But at no time has Congress repealed or amended Section 355(c)(1).

79.     A court in this District has already rejected the notion that PDUFA supplanted FDA's obligation to comply with Section 355(c)(1).  In *Sandoz*, a drug applicant challenged FDA's substantial delay in acting on its application for the drug Omnitrope.  427 F. Supp. 2d at 31.  In that case, FDA did "not dispute the fact that [it] ha[d] not acted in accordance with" Section 355(c). *Id.* at 34.  Instead, it "argued that the 180-day 'time frame' is 'aspirational rather than mandatory, … based on its reading of the Prescription Drug User Fee Act of 1992." *Id.* (quoting Def's

Motion). The Court disagreed, concluding that the FDCA "requires FDA to take action on an NDA within 180 days of its submission," and that this is "a mandatory obligation." *Id.* at 34. And PDUFA did not, "through its circuitous reference to the Performance Goals, repeal[] by implication 21 U.S.C. § 355(c)." *Id.* at 35. Finding no irreconcilable conflict between the FDCA and PDUFA, the Court explained that FDA's PDUFA commitment letter "concerns the FDA's goals, not [its] statutory obligations. And the mere fact that FDA sets its aspirations somewhere below what the statute requires is not reason enough to erase the statutory provision." *Id.* at 37. "FDA must comply with the statute, not visa-versa." *Id.*

80.    Nor do FDA's PDUFA goals constitute an "additional period … agreed upon by the Secretary and the applicant" to extend the agency's statutory deadlines under Section 355(c)(1), solely by virtue of pharmaceutical industry participation in FDA's process of establishing new PDUFA goals. Section 355(c)(1)'s text is clear that any "agreement" to extend FDA's review period must be formed between the agency "and *the applicant*." 21 U.S.C. § 355(c)(1) (emphasis added). "It 'is a rule of law well established that the definite article 'the' particularizes the subject which it precedes.'" *Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urban Dev.*, 106 F. 4th 1134, 1144 (D.C. Cir. 2024) (quoting *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000)); *see also United States v. Bailey*, 2023 WL 2139365, at *5 (D.D.C. Feb. 21, 2023) ("Where used as an adjective, and in contrast to an indefinite article (e.g., 'a'), which 'points to nonspecific objects, things, or persons that are not distinguishable from the other members of a class,' a definite article (e.g., 'the') speaks to something specific and distinct." (quoting The Chicago Manual of Style §§ 5.70-71, 5.75, pp. 166-167 (15th ed. 2003)).

81.    FDA has argued that the creation of the PDUFA goals, which involves "negotiating" with members of the pharmaceutical industry (including PhRMA, which Vanda is too small to be eligible to join) constitute the "agreement" contemplated by the statute. Hr'g Tr. 6:7-19, *Vanda Pharms. Inc. v. FDA*, No. 24-cv-351 (Oct. 22, 2024) (noting FDA's position that "the

industry" agreed with FDA to extend the timeline for anyone is "not consistent with the text"); *see also* Hr'g Tr. 39:16-25, *Vanda Pharms. Inc. v. FDA*, No. 24-cv-351 (Jan. 9, 2025) (noting that FDA negotiated with PhRMA, among other attendees). But Section 355(c)(1) refers to "the applicant"—that can only mean the specific "person" filing "the application" under Section 355(b). And even if the PDUFA goals *could* arguably constitute an "agreement" under Section 355(c), that agreement could only possibly extend to companies that actually participated either themselves or through a representative—which Vanda did not.[10]

82.     For both its gastroparesis and motion sickness NDAs, Vanda is "the applicant" referenced in the statute. Vanda never agreed to extend FDA's statutory deadline to act on its gastroparesis NDA. Nor has it (or will it) agree to extend FDA's deadline to act on its motion sickness NDA. Quite the contrary, Vanda has repeatedly insisted that FDA *follow* its statutory requirements. This exception for agreement is clearly inapplicable to both NDAs.

### 2.     *FDA's contrary regulations are unlawful.*

83.     FDA's regulations contradict the FDCA by purporting to give the agency an extra-statutory 60-day period up front to determine whether an application has been "filed" (*see* 21 C.F.R. § 314.101) and an additional 60-day period on the backend to provide the notice of opportunity for a hearing, and only if the applicant affirmatively requests one (*see id.* § 314.110). These regulations are unlawful.

84.     *First*, FDA's 60-day filing regulation is unlawful.

---

[10]   Vanda is not eligible to be a member of PhRMA, which requires its members to have, among other things, a three-year average global R&D spending of at least $200 million per year. Press Release, *PhRMA Welcomes Genmab to the Association*, PhRMA (Dec. 14, 2023), https://phrma.org/resources/phrma-welcomes-genmab-to-the-association. As a relatively small pharmaceutical company, last year Vanda's total *revenue* was under $200 million. Press Release, *Vanda Pharmaceuticals Reports Fourth Quarter and Full Year 2024 Financial Results*, PR Newswire (Feb. 13, 2025), https://www.prnewswire.com/news-releases/vanda-pharmaceuticals-reports-fourth-quarter-and-full-year-2024-financial-results-302376529.html.

85. FDA's regulations provide that an NDA is not "filed" when FDA receives it; rather, the agency has "60 days" from receipt to "determine whether the NDA may be filed." 21 C.F.R. § 314.101(a)(1). The regulations further provide that the "date of filing will be the date 60 days after the date FDA received the NDA," and this new "filing" date "begins the 180–day period described in section 505(c) of the Federal Food, Drug, and Cosmetic Act." *Id.* § 314.101(a)(2).

86. When interpreting statutes, the court "begin[s] 'where all such inquiries must begin: with the language of the statute itself.'" *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019) (quoting *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012)).

87. The term "file" in this context most naturally means "to deliver (as a legal paper or instrument) after complying with any condition precedent (as the payment of a fee) to the proper officer for keeping on file or among the records of his office." *See* File, Webster's Third New International Dictionary 849 (1986).

88. Moreover, under the statute, *the applicant* "files" the application, not the Secretary. *See* 21 U.S.C. § 355(b)(1)(A) ("*Any person* may *file* with the Secretary an application with respect to any drug subject to the provisions of" the FDCA). The statute makes no mention of any procedure by which the Secretary determines whether or not an application "may be filed" before the 180-day review period begins.

89. Thus, the most natural and unambiguous understanding of the text of § 355(c) is that the 180-day period runs from the date the applicant filed the NDA.

90. The FDCA's text resolves the issue on its own. But FDA's own regulatory history confirms Vanda's reading of the statute. Historically, FDA regulations authorized the agency to reject incomplete filings but otherwise treated complete applications as "filed" on "the date on which [the] application [was] received." 21 Fed. Reg. 5,576, 5,579 (July 25, 1956) (prior 21 C.F.R. § 130.5) (emphasis added); 6 Fed. Reg. 1,920, 1,921 (Apr. 15, 1941) (prior 21 C.F.R. § 2.110) (same); 3 Fed. Reg. 3,161, 3,168 (Dec. 28, 1938) (implementing FDCA Section 505(d)); *see also*

39 Fed. Reg. 11,680, 11,726 (Mar. 29, 1974) (prior 21 C.F.R. § 314.110) (same). When Congress amended Section 355(c)(1) to require FDA to act on an application within 180 days of a filing, it "acted against the backdrop of the FDA's consistent" position that a complete application is "filed" when the agency receives it. *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). This history reinforces the plain meaning of the term "file," which captures Congress's intent that the 180-day clock would begin when the applicant submits the application, not 60 days later or any other later date that satisfies the agency.

91.     *Second*, FDA's CRL regulation is unlawful, insofar as it allows the FDA to avoid its statutory deadline for action on an application. At the very least, it is unlawful to apply the regulation to Vanda.

92.     FDA's complete response letter regulations purport to extend the statutorily mandated deadline for providing either approval or a notice of opportunity for a hearing. Adopted in 2008, those regulations provide that, rather than giving the notice of opportunity for hearing required by statute, at or before the 180-day mark, FDA instead "will send the applicant a complete response letter if the agency determines that [it] will not approve the application … in its present form." 21 C.F.R. § 314.110(a). The regulations then give the applicant three options: (1) "[r]esubmission" of the NDA, "addressing all deficiencies identified in the complete response letter"; (2) "[w]ithdrawal" of the application; or (3) that the applicant must request the opportunity for a hearing guaranteed by statute. *Id.* § 314.110(b)(1)-(3). And even when the applicant "request[s]" the "opportunity for a hearing," the regulations purport to give FDA 60 *more* days before it must issue the notice of opportunity for a hearing. *Id.* § 314.110(b)(3).

93.     The regulations further assert that "[a]n applicant agrees to extend the review period under [21 U.S.C. § 355(c)(1)] until it takes any of the actions" just listed. 21 C.F.R. § 314.110(c).

94.     A regulation that is inconsistent with a statute is void. *See, e.g.*, *NAACP v. DeVos*, 485 F. Supp. 3d 136, 145 (D.D.C. 2020) ("The authority to issue regulations is not the power to

make law, and a regulation contrary to a statute is void.") (quoting *Orion Reserves*, 553 F.3d at 703). To the extent that the CRL regulation allows FDA to avoid its statutory deadline for action, the complete response letter regulations conflict with the statute, and are therefore a nullity. *Id.*; *see also Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013) (Kavanaugh, J.) ("A valid statute always prevails over a conflicting regulation, and a regulation can never trump the plain meaning of a statute.") (quotation marks and citation omitted; alteration incorporated).

95.    Nor is the regulation's flat assertion that "[a]n applicant agrees to extend" FDA's statutory deadline "until [the applicant] takes" specified action (21 C.F.R. § 314.110(c)) a legitimate application of the statute's requirement that the deadline "shall" be either 180 days "or such additional period as may be agreed upon by the [FDA] and the applicant." 21 U.S.C. § 355(c)(1). Under fundamental principles of contract law, an "agree[ment]" (*id.*) both "requires a bargain in which there is a manifestation of mutual assent" (Restatement (Second) of Contracts § 17)—that is, it cannot be created by one party unilaterally—and cannot exist absent bargained-for consideration (*id.* § 71), which is also lacking here, where the applicant gains nothing from purportedly absolving FDA from its statutory deadline. *See, e.g.*, *United States v. Honeywell Int'l, Inc.*, 47 F. 4th 805, 813 (D.C. Cir. 2022) (courts "presume Congress employs common law terms with their common law meaning, absent a contrary indication in the statute"); *cf. also* Restatement (Second) of Contracts § 177 (providing that where one "party's manifestation of assent is induced by undue influence by the other party, the contract is voidable by the victim").

96.    FDA's regulations thus guarantee FDA at the very least 60 additional days beyond the statutory 180 days to resolve new drug applications. The agency grants itself an extra 60 days on the front end by deeming that applications are not "filed" until "60 days after the date FDA receive[s] the NDA." 21 C.F.R. § 314.101(a)(2). That makes 240 days.

97.    FDA also stalls issuing the NOOH with a "complete response letter" (CRL), insisting unilaterally that the "applicant agrees to extend" the statutory deadlines upon receipt of a CRL

as a condition for seeking drug approval. 21 C.F.R. § 314.100(c)(1). The CRL regulation shifts the onus to the applicant to affirmatively request the NOOH to which it is statutorily entitled, and even then, the agency takes an additional 60 days to provide it. 21 C.F.R. § 314.110(b)(3).

98. All told, FDA has substantially increased the amount of time contemplated by the statute, which was intended to ensure expeditious decisions on new drug applications. But "a regulation contrary to a statute is void" (*NAACP*, 485 F. Supp. 3d at 145) and the Court should set these regulations unlawful to the extent they extend FDA's statutory deadline without actual agreement between "the Secretary and the applicant." 21 U.S.C. § 355(c)(1). At a minimum, the Court can, and should, declare it unlawful to apply those regulations to Vanda.

### 3.    *The Court should compel FDA to act lawfully*

99. FDA has made it overwhelmingly clear that it will not abandon its adherence to its PDUFA goals and unlawful regulations without Court intervention.

100. Because FDA adhered to its regulations and PDUFA goal instead of the FDCA when it reviewed Vanda's gastroparesis NDA, it took nearly *three times* the time Congress allotted to issue an NOOH. Now, 522 days have passed since Vanda submitted its application and still FDA is yet to even schedule a hearing. FDA's statutory deadlines have long since passed.

101. Vanda submitted its application for motion sickness on December 30, 2024. FDA's statutory obligation to respond via either an approval or a notice of opportunity for a hearing is thus June 28, 2025. But FDA will not "deem" Vanda's NDA filed until February 28, 2025—two months after Vanda submitted it—once again applying its unlawful 60-day filing regulation to Vanda.

102. Further, Vanda has no reason to expect that FDA will act on its application for motion sickness within the statutory deadline, given the agency's pattern and practice of routine delay, which is enshrined in the agency's own regulations and self-selected PDUFA goals. *See Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 385 (D.C. Cir. 2018) (holding plaintiff's "complaint

adequately raised a challenge to the Department of Homeland Security's" pattern and practice of "shrugging off … statutory and regulatory limitations" that require H-2A shepherd petitions and visa extensions to be "temporary" by "automatically extending 'temporary' H-2A petitions for multiple years.").

103.    According to one recent agency analysis of NDA approvals in 2019, the average time between submission and approval was 273.8 days. *See FDA Drug Review Timeline Transparency; Statement of Policy,* 86 Fed. Reg. 4,083, 4,084 (Jan. 15, 2021).  And FDA's own self-selected "goal" under the PDUFA to act on standard NDAs within 10 months of the filing date similarly openly disregards the FDCA's deadlines.

104.    Vanda's own experience with the agency confirms the pattern.  It took FDA 1,410 days to privately issue Vanda an NOOH on its sNDA for a jet lag indication for Hetlioz®, and another 46 days to publish the notice in the federal register.  Even after this egregious delay, Vanda was forced to seek judicial intervention for a hearing.  Nearly *2,000 days* after Vanda submitted its application—and over 500 days since Vanda had requested a hearing—Judge Nichols ordered FDA to "finally resolve Vanda's application or commence a hearing" by a date certain.  *Vanda Pharms.*, 2024 WL 307387, at *6.  It similarly took FDA 400 days to issue a NOOH for its sNDA for an insomnia indication for Hetlioz®.  And it took 477 for FDA to privately issue an NOOH for Vanda's NDA for tradipitant to treat gastroparesis in this case in adults and 484 to publish the notice in the federal register.

105.    In the FDCA, Congress provided express deadlines for FDA to act:  180 days to grant an application or issue an NOOH; 300 days to commence a hearing.  21 U.S.C. § 355(c)(1); *see Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999) ("[T]he distinction between agency action 'unlawfully withheld' and 'unreasonably delayed' turns on whether Congress imposed a date-certain deadline on agency action." (citing *Sierra Club v. Thomas*, 828 F.2d 783, 794-795 & n.77-80 (D.C. Cir. 1987)).  And "when Congress by organic statute sets a specific deadline

for agency action, neither the agency nor any court has discretion.  The agency must act by the deadline.  If it withholds such timely action, a reviewing court must compel the action unlawfully withheld." *Id.*; *see also South Carolina v. United States*, 243 F. Supp. 3d 673, 695 (D.S.C. 2017) (Childs, J.) ("[T]he plain language of § 706(1) requires a reviewing court that has found that agency action has been unlawfully withheld to issue an order compelling that agency action and does not permit the court to decline to do so based on equitable considerations.").

106.    FDA's review structure guaranteed the delay on Vanda's gastroparesis NDA and ensures that it will delay once again on Vanda's motion sickness NDA.  Indeed, FDA structures its review process with carefully determined dates that track the PDUFA goal date, *not* the FDCA's deadlines.  For example, the FDA's manual for NDA reviews explicitly allots 8 months for the primary review to be completed and a full 12 months from submission of the application for staff to take official action on the application.  *See* Ex. 1, FDA, *CDER 21st Century Review Process Desk Reference Guide* at 1, 47 (providing for an "action date" at "Month 12" from receipt of the application).

107.    Thus, FDA's actions here are not those of an agency that, although attempting to make its statutory deadlines, falls behind due to unexpected resource constraints or circumstances unique to the application.  Rather, FDA's carefully delineated review structure ensures that the review will end no sooner than the PDUFA date.

108.    Relief compelling the agency to act on time is warranted under *Telecommunications Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) (*TRAC*).

109.    In *TRAC*, the D.C. Circuit set out a number of factors that govern claims of unreasonable agency delay:

> 1.  the time agencies take to make decisions must be governed by a rule of reason;

2. where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

3. delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

4. the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

5. the court should also take into account the nature and extent of the interests prejudiced by delay; and

6. the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed. *Id.*

110.    Those factors are satisfied here. *See, e.g.*, *Sandoz*, 427 F. Supp. 2d at 33-41 (finding FDA's noncompliance with the 180-day deadline for NDAs unlawful, and compelling FDA action pursuant to 5 U.S.C. § 706(1)); *Vanda Pharms.*, 2024 WL 307387, at *3 (noting that "Congress … provided a timetable here that the agency acknowledges it has exceeded" and ordering FDA to act on Vanda's application under 5 U.S.C. § 706(1)).

111.    In particular, the FDCA's 180-day deadline for response to an NDA is both binding and a judicially cognizable "rule of reason" (*see Sandoz*, 427 F. Supp. 2d at 34-38), and the agency's routine delays are "egregious" (*id.* at 40).  Moreover, FDA routinely flouts this obligation.  According to one recent agency analysis of NDA approvals in 2019, the average time between submission and approval was 273.8 days. *See FDA Drug Review Timeline Transparency; Statement of Policy,* 86 Fed. Reg. 4,083, 4,084 (Jan. 15, 2021).  And FDA's own self-selected "goal" under the PDUFA of taking action on standard NDAs within 10 months of the filing date— i.e., in one year—similarly openly disregards the statutory deadline.

112.    FDA's complete response letter regulations do not absolve the agency of its statutory responsibility to act by approving the NDA or giving notice of an opportunity for hearing within 180 days.  *See* 21 U.S.C. § 355(c)(1).  As noted above, those regulations are unlawful as inconsistent with the FDA's governing statute and therefore cannot provide a legitimate basis for an agency's action (or failure to act). *See, e.g.*, *NAACP*, 485 F. Supp. 3d at 145 ("The authority to issue regulations is not the power to make law, and a regulation contrary to a statute is void.") (quoting *Orion*, 553 F.3d at 703).

113.    Nor is the regulation's flat assertion that "[a]n applicant agrees to extend" FDA's statutory deadline "until [the applicant] takes" specified action (21 C.F.R. § 314.110(c)) a legitimate application of the FDCA's provision that the deadline "shall" be either 180 days "or such additional period as may be agreed upon by [FDA] and the applicant."  21 U.S.C. § 355(c)(1). Because there was no legitimate "agree[ment]" (21 U.S.C. § 355(c)(1)) between FDA and Vanda to extend FDA's statutory deadline to act, that deadline has long since passed, notwithstanding anything to the contrary in the complete response letter regulations.  *See, e.g.*, *NAACP*, 485 F. Supp. 3d at 145.  As in *Sandoz*, therefore, FDA's delay on Vanda's NDAs warrants APA and mandamus relief.

114.    Finally, this case is an appropriate instance for the Court to exercise its equitable powers to enforce the statutory deadline.  Unlike the situation that confronted the D.C. Circuit in *In re Barr*, 930 F.2d 72, the material circumstances within FDA are substantially different now. As this Court noted in *Sandoz*, FDA's funding drought, which was "a driving force behind the FDA's delay" in *In re Barr*, was ameliorated by Congress when it enacted PDUFA.  *Sandoz*, 427 F. Supp. 2d at 40.  "With additional funds now available to the FDA for its processing of NDAs, unreasonableness in agency's delay comes sooner than it did prior to the PDUFA."  *Id.*  Moreover, as the Court also recognized, mandamus here does not "necessarily require that the agency formulate its final decision," rather, the agency can (and indeed must) offer Vanda the notice of

opportunity for hearing to which it is entitled under the statute. *Id.* at 39 n.11. Thus, the concerns that animated the court in *In re Barr* about allocation of agency resources are not implicated here.

115.    Injunctive relief is also warranted with respect to the gastroparesis NDA. The FDCA's 300-day deadline for response to an NDA is both binding and a judicially cognizable "rule of reason" (*see Sandoz*, 427 F. Supp. 2d at 34-38), and the agency's routine delays are "egregious" (*id.* at 40). *See Vanda Pharms.*, 2024 WL 307387, at *3 (noting that "Congress … provided a timetable here that the agency acknowledges it has exceeded" and ordering FDA to act on Vanda's application under 5 U.S.C. § 706(1)).

116.    Furthermore, the other *TRAC* factors support relief for the same reasons as described in *Vanda Pharms.*, 2024 WL 307387, at *5. Vanda is not attempting to jump a long queue, as FDA rarely issues NOOHs. And FDA's delays stem from its own extra-statutory choices—including delaying NOOHs, delaying publication, and pursuing a protracted summary judgment process.

117.    In sum, the FDA must abide by the FDCA's mandatory timeframes. This Court should order FDA to comply with the law: (a) immediately commence a hearing on Vanda's gastroparesis NDA; and (b) either approve Vanda's motion sickness NDA or provide notice in the Federal Register of an opportunity for a hearing by June 28, 2025—absent actual agreement between Vanda and FDA to extend these deadlines. 21 U.S.C. § 355(c)(1).

**D.    Vanda's challenge to FDA's regulations falls within the statute of limitations.**

118.    "An agency's regulations may be attacked in two ways" after the six-year statutory limitations period under 28 U.S.C. § 2401(a) expires. *NLRB Union v. FLRA*, 834 F.2d 191, 195 (D.C. Cir. 1987). When an agency applies a rule, parties affected by that application may challenge the rule "on the ground that it conflicts with the statute from which its authority derives." *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014).

119.    FDA has plainly applied the challenged rules to Vanda in this case.  FDA applied its 60-day filing regulation to Vanda's tradipitant NDA for gastroparesis when it "deemed" the NDA filed on November 17, 2023, 60 days after Vanda submitted it on September 18, 2023.  FDA applied its CRL regulation to that same NDA when it issued a complete response letter on September 18, 2024—following the PDUFA goal date, not the statute—and waiting until January 7, 2025, to provide Vanda with an NOOH.  And FDA is presently relying on its summary judgment regulations and practices to further delay a hearing.  Indeed, it has been six weeks since FDA sent Vanda the NOOH, and FDA has not even set a schedule for briefing on *whether* to hold a hearing, much less a schedule *for* that hearing.

120.    So too with Vanda's motion sickness NDA.  Once again relying on its 60-day filing regulation, FDA informed Vanda that it would not "file" the application until February 28, 2025, even though the application was filed in December 2024.  And if past is prologue, FDA will yet again apply its invalid CRL regulations, PDUFA goal dates, and drawn-out summary judgment procedures to delay action on Vanda's motion sickness application, and that delay is directly contrary to Congress's mandate to FDA that it act within a specific time.

121.    FDA's application of its regulations to Vanda here is sufficient under *Weaver.*  In *Weaver*, the D.C. Circuit rejected the argument that its rule is somehow limited only to particular agency actions. 744 F.3d at 145 ("[T]he sort of 'application' that opens a rule to such a challenge is not limited to formal 'enforcement actions.'"); *see Am. Scholastic TV Programming Found. v. FCC*, 46 F.3d 1173, 1178 n.2 (D.C. Cir. 1995) (parties may challenge regulations as in excess of statutory authority in "nonenforcement proceedings where the party is nevertheless harmed by application of the regulation"); *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 971 F.3d 340, 348 (D.C. Cir. 2020) (FEC's reliance on its regulations to *not* enforce a rule similarly constituted an "application" of that rule that is cognizable under *Weaver*); *see also id.* (interpreting D.C. Circuit precedent to mean that *Weaver* can be "triggered 'by nonenforcement

proceedings where the plaintiff is nevertheless harmed by the application of the regulation.'" (quoting *Am. Scholastic TV Programming Found. v. FCC*, 46 F.3d 1173, 1178 n.2 (D.C. Cir. 1995)). Indeed, *Weaver* itself applied this principle in the context of unlawful agency inaction. 744 F.3d at 147.

122. Vanda can thus challenge the validity of FDA regulations in this action because FDA has applied the challenged regulations to Vanda's gastroparesis and motion sickness NDAs. *Id.*; *see also Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958); *N.L.R.B. Union v. Fed. Lab. Rels. Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987) (noting "the settled law of this circuit" allows for "attacks on the substantive validity of regulations" when the agency applies the challenged rule to the plaintiff); *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 316 F. Supp. 3d 349, 383 (D.D.C. 2018), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020) ("Indeed, the law is clear that the plaintiffs may bring a facial challenge to the regulation as a component of an as-applied challenge by seeking relief to invalidate and vacate [the challenged regulation]."); *see also Genuine Parts Co. v. Envtl. Prot. Agency*, 890 F.3d 304, 316 (D.C. Cir. 2018) ("[A]n agency's regulations may be attacked … once the statutory limitations period has expired … on the ground that the issuing agency acted in excess of its statutory authority in promulgating them." (quoting *NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987)).

123. In such cases, declaratory relief and vacatur of the challenged rule is appropriate. *See CREW,* 971 F.3d 340, 350 (D.C. Cir. 2020) (affirming district court's vacatur of the challenged rule, in a post-application posture, as the rule "conflict[ed] with the FECA's unambiguous terms twice over."); *Am. Tel. & Tel. Co. v. FCC*, 978 F.2d 727, 737 (D.C. Cir. 1992) (vacating rule as contrary to the Communications Act in challenge brought after application of the rule to a specific party).

## CLAIMS FOR RELIEF
### COUNT I
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(1)
### DELAYED HEARING ON GASTROPARESIS NDA

124.    Vanda incorporates and realleges the foregoing paragraphs as though fully set forth herein.

125.    The APA empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

126.    The FDCA imposes a nondiscretionary duty on FDA to either "approve" Vanda's NDA or "give [Vanda] notice of an opportunity for a hearing" in the Federal Register "[w]ithin one hundred and eighty days after the filing of" the NDA and that such a hearing "shall commence not more than" 120 days after notice has been given.  21 U.S.C. § 355(c)(1); *see* 21 C.F.R. § 314.200(a)(2).  The FDCA thus requires FDA to commence a hearing within 300 days of the date an applicant submits an NDA, as long as the applicant timely requests such a hearing.

127.    Vanda submitted its gastroparesis NDA 522 days ago on September 18, 2023. Vanda timely requested a hearing on January 26, 2025.  FDA has not yet scheduled a hearing.

128.    The Court should therefore "compel" FDA to commence a hearing on Vanda's gastroparesis NDA by a date certain, unless Vanda and FDA mutually agree to extend the deadline.

### COUNT II
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(1)
### DELAYED ACTION ON MOTION SICKNESS NDA

129.    Vanda incorporates and realleges the foregoing paragraphs as though fully set forth herein.

130.    The APA empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

131.    The FDCA imposes a nondiscretionary duty on FDA to either "approve" Vanda's NDA or "give [Vanda] notice of an opportunity for a hearing" in the Federal Register "[w]ithin

one hundred and eighty days after the filing of" the NDA.  21 U.S.C. § 355(c)(1); *see* 21 C.F.R. § 314.200(a)(2).  But FDA's pattern and practice of following its PDUFA goal deadlines suggest that FDA will not act until [December 30, 2025].  FDA thus intends to unlawfully withhold agency action.

132.    The Court should therefore "compel" FDA to act on Vanda's motion sickness NDA within its 180-day statutory deadline pursuant to 5 U.S.C. § 706(1) by either approving the NDA or publishing notice of an opportunity for hearing in the Federal Register, unless Vanda and FDA mutually agree to extend the deadline.

**COUNT III**
**MANDAMUS ACT, 28 U.S.C. § 1361**
**DELAYED HEARING ON GASTROPARESIS NDA**

133.    Vanda incorporates and realleges the foregoing paragraphs as though fully set forth herein.

134.    The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer… of the United States or any agency thereof to perform a duty owed to the plaintiff."   28 U.S.C. § 1361; *see also id.* § 1651 (All Writs Act, providing that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law").

135.    The FDCA imposes a nondiscretionary duty on FDA to either "approve" Vanda's NDA or "give [Vanda] notice of an opportunity for a hearing" in the Federal Register "[w]ithin one hundred and eighty days after the filing of" the NDA and that such a hearing "shall commence not more than" 120 days after notice has been given.  21 U.S.C. § 355(c)(1); *see* 21 C.F.R. § 314.200(a)(2).  The FDCA thus requires FDA to commence a hearing within 300 days of the date an applicant submits an NDA, as long as the applicant timely requests such a hearing.

136.    Vanda submitted its gastroparesis NDA 522 days ago on September 18, 2023. Vanda timely requested a hearing on January 26, 2025.  FDA has not yet scheduled a hearing.

137.    The factors laid out by the D.C. Circuit in *TRAC*, 750 F.2d 70, warrant relief.

138.    The Court should therefore "compel" FDA to commence a hearing on Vanda's gastroparesis NDA by a date certain, unless Vanda and FDA mutually agree to extend the deadline.

**COUNT IV**
**MANDAMUS ACT, 28 U.S.C. § 1361**
**DELAYED ACTION ON MOTION-SICKNESS NDA**

139.    Vanda incorporates and realleges the foregoing paragraphs as though fully set forth herein.

140.    The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer… of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361; *see also id.* § 1651 (All Writs Act, providing that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law").

141.    The FDCA imposes a nondiscretionary duty on FDA to either "approve" Vanda's NDA or "give [Vanda] notice of an opportunity for a hearing" in the Federal Register "[w]ithin one hundred and eighty days after the filing of" the NDA.  21 U.S.C. § 355(c)(1); *see* 21 C.F.R. § 314.200(a)(2).  However, FDA's pattern and practice of following its PDUFA goal deadlines suggest that FDA will not act until [December 30, 2025].  FDA thus intends to unlawfully withhold agency action.

142.    The factors laid out by the D.C. Circuit in *TRAC*, 750 F.2d 70, warrant relief.

143.    The Court should therefore issue a writ of mandamus compelling FDA to act on Vanda's NDA within its 180-day statutory deadline by either approving the NDA or publishing notice of an opportunity for hearing in the Federal Register, unless Vanda and FDA mutually agree to extend the deadline.

## COUNT V
## ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
## UNLAWFUL APPLICATION OF REGULATIONS TO VANDA

144.    Vanda incorporates and realleges the foregoing paragraphs as though fully set forth herein.

145.    The APA authorizes courts to set aside agency action that is contrary to law.  5 U.S.C. § 706(2).

146.    An agency regulation "contrary to a statute is void."  *Orion*, 553 F.3d at 703; *see also Texas v. EPA*, 726 F.3d at 195 ("A valid statute always prevails over a conflicting regulation, and a regulation can never trump the plain meaning of a statute").

147.    FDA's regulations that purport to extend the deadline for the agency to either approve an NDA or provide a notice of opportunity for a hearing are contrary to the plain text of the governing statute, 21 U.S.C. § 355.

148.    The 60-day "filing" regulation is contrary to the statute because FDA uses it to dramatically extend the statutory deadline.  By not deeming an application "filed" until 60 days after the applicant submits it, FDA affords itself 60 extra days beyond what Congress mandated. This is irreconcilable with the statutory scheme.

149.    The CRL regulations is also contrary to the statute in two ways.  *First*, the complete response letter regulations decree that an applicant "agree[s] to extend the review period under section 505(c)(1) or (j)(5)(A) of the [FDCA] until it takes any of the actions listed in" the agency's regulation in response to the CRL.  *Second*, the CRL regulations permit at least 60 additional days of delay after an applicant "requests" the notice of opportunity for a hearing.  This scheme is irreconcilable with the statute.

150.    FDA's actions are not authorized by PDUFA.  A court in this district has already held that PDUFA does not alter the 180-day deadline in § 355(c) nor change the FDA's obligation to comply with the statute. *See Sandoz*, 427 F. Supp. 2d at 37 (FDA's PDUFA commitment letter

"concerns the FDA's goals, not [its] statutory obligations"). Moreover, nothing in PDUFA represents a blanket "agreement" with all applicants to extend the FDA's review time under § 355(c)(1).

151. Because FDA's regulations are contrary to the statutory text, they are invalid. *See, e.g.*, *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) ("It is a basic tenet that 'regulations, in order to be valid, must be consistent with the statute under which they are promulgated.'" (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977))).

152. Vanda can challenge the validity of the regulations in this action in which the rules have been applied to Vanda. *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142 (D.C. Cir. 2014); *see also Functional Music, Inc. v. F.C.C.*, 274 F.2d 543, 546 (D.C. Cir. 1958); *N.L.R.B. Union v. Fed. Lab. Rels. Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987) (noting "the settled law of this circuit" allows for "attacks on the substantive validity of regulations" when the agency applies the challenged rule to the plaintiff).

153. In such cases, declaratory relief and vacatur of the challenged rule is appropriate. *See CREW*, 971 F.3d 340, 350 (D.C. Cir. 2020) (affirming district court's vacatur of the challenged rule, in a post-application posture, as the rule "conflict[ed] with the FECA's unambiguous terms twice over."); *Am. Tel. & Tel. Co. v. FCC*, 978 F.2d 727, 737 (D.C. Cir. 1992) (vacating rule as contrary to the Communications Act in challenge brought after application of the rule to a specific party).

154. FDA's regulations should be vacated to the extent they conflict with the FDCA's clear statutory mandates.

155. FDA's application of its regulations to Vanda in the context of these applications is unlawful. The Court should declare that application of these regulations to Vanda is unlawful and enjoin FDA from applying them to Vanda.

## COUNT VI
## DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201

156.    Vanda incorporates and realleges the foregoing paragraphs as though fully set forth herein.

157.    The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

158.    As described above, there is an actual controversy between Vanda and the FDA that is within this Court's jurisdiction.

159.    Vanda therefore requests, in addition to mandamus and APA relief, that the Court issue a declaratory judgment declaring that FDA's refusal to timely commence a hearing on Vanda's gastroparesis NDA violates the statutory timeframes imposed by the FDCA; FDA's failure to approve Vanda's motion sickness NDA or issue a notice of opportunity for hearing violates the statutory timeframes imposed by the FDCA; that the 60-day filing regulation is unlawful; that the complete response regulations are unlawful to the extent they contradict the statutory deadlines and requirement of agreement in 21 U.S.C. § 355(c)(1); and that the FDCA's 180-day deadline, not FDA's self-imposed PDUFA goal date, governs its review of new drug applications.

160.    Among other reasons, these regulations are invalid because they are incompatible with the governing statutory text.

## PRAYER FOR RELIEF

WHEREFORE, Vanda respectfully requests that the Court enter judgment in its favor and that the Court:

1.    "[C]ompel" FDA to commence a hearing on Vanda's gastroparesis NDA immediately;

2. "[C]ompel" FDA to issue an approval or a notice of opportunity for a hearing on Vanda's motion sickness NDA by June 28, 2025;

3. Issue a writ of mandamus requiring FDA to commence a hearing on Vanda's gastro-paresis NDA immediately;

4. Issue a writ of mandamus requiring FDA to issue an approval or a notice of opportunity for a hearing on Vanda's motion sickness NDA by June 28, 2025;

5. Declare that the FDCA requires FDA to issue an approval or a notice of an opportunity for a hearing within 180 days after an applicant submits a new drug application;

6. Declare that FDA's 60-day filing regulation (21 C.F.R. § 314.101(a)(2)) and its complete response letter regulations (21 C.F.R. § 314.110(a), (b)(3), (c)(1)) are unlawful and void;

7. Set aside FDA's 60-day filing regulation (21 C.F.R. § 314.101(a)(2)) and its complete response letter regulations (21 C.F.R. § 314.110(a), (b)(3), (c)(1))) that are contrary to the FDCA;

8. Declare that FDA's interpretation that 21 C.F.R. § 314.200(f) provides no deadline for FDA to provide an analysis and proposed order on whether to recommend a hearing, as is needed for the FDA's summary judgment process to begin, is unlawful and contrary to statute.

9. Declare that FDA's application of the 60-day filing regulation and the complete response letter regulations to Vanda is unlawful;

10. Declare that FDA's 180-day deadline to act under the FDCA, not its PDUFA goal date, governs its review of Vanda's NDAs;

11. Declare that, if FDA elects not to approve an application, the FDCA requires FDA to commence a hearing within 300 days after an applicant submits a new drug application; and

47

12. Award Vanda such other and further relief as the Court may deem just and proper.

Dated: February 21, 2025

Respectfully submitted,

/s/ *Paul W. Hughes*
Paul W. Hughes (Bar No. 997235)
Sarah P. Hogarth (Bar No. 1033884)
Grace Wallack (Bar No. 1719385)
Nicole E. Wittstein (Bar No. 1725217)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Attorneys for Plaintiff*