**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

VANDA PHARMACEUTICALS INC.,

*Plaintiff*,

v.                                                          No. 1:25-cv-536-ACR

FOOD AND DRUG ADMINISTRATION et al.,

*Defendants*.

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Paul W. Hughes (D.C. Bar No. 997235)
Sarah P. Hogarth (D.C. Bar No. 1033884)
Grace Wallack (D.C. Bar No. 1719385)
MᶜDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Attorneys for Plaintiff
Vanda Pharmaceuticals Inc.*

**ORAL ARGUMENT SCHEDULED MAY 22, 2025, at 11:00 a.m.**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

Glossary of Abbreviations ................................................................................................. viii

Introduction .......................................................................................................................... 1

Background .......................................................................................................................... 3

    A.    FDA's statutory duty to act on new drug applications ....................................... 3

    B.    FDA's contrary Rules ........................................................................................ 4

        1.    The 60-Day Filing Regulation ................................................................ 4

        2.    The Industry Agreement Rule ................................................................. 4

        3.    The Complete Response Letter Regulations ........................................... 5

    C.    FDA's delay of Vanda's tradipitant NDAs using the Rules ............................. 7

Argument .............................................................................................................................. 9

    A.    FDA's Rules are unlawful .................................................................................. 9

        1.    FDA's 60-Day Filing Regulation is inconsistent with the statute. ....... 10

        2.    FDA's Industry Agreement Rule is unlawful. ...................................... 18

        3.    FDA's CRL Regulations conflict with FDA's clear statutory obligations ........... 24

    B.    Vanda is entitled to relief. ............................................................................... 26

        1.    Vanda brought a timely post-application challenge to the Rules. ......... 27

        2.    The Court should vacate FDA's unlawful Rules. ................................. 30

        3.    At a minimum, the Court should issue declaratory relief. ................... 34

Conclusion .......................................................................................................................... 37

# TABLE OF AUTHORITIES[*]

**Cases**

*Am. Scholastic TV Programming Found. v. FCC,*
46 F.3d 1173 (D.C. Cir. 1995) ................................................................29

*\*Am. Tel. & Tel. Co. v. FCC,*
978 F.2d 727 (D.C. Cir. 1992) ..........................................29, 31, 32, 33, 36

*In re Barr Lab'ys, Inc.,*
930 F.2d 72 (D.C. Cir. 1991) ................................................................25

*Bondi v. VanDerStok,*
604 U.S. ---, 2025 WL 906503 (Mar. 26, 2025) ..............................31, 32

*Brecht v. Abrahamson,*
507 U.S. 619 (1993) ................................................................................15

*Brennan v. Dickson,*
45 F.4th 48 (D.C. Cir. 2022) ..........................................................31, 32

*Bruesewitz v. Wyeth LLC,*
562 U.S. 223 (2011) ................................................................................15

*Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S,*
566 U.S. 399 (2012) ................................................................................11

*Changji Esquel Textile Co. v. Raimondo,*
40 F.4th 716 (D.C. Cir. 2022) ..............................................................15

*\*Citizens for Resp. & Ethics in Wash. v. FEC,*
971 F.3d 340 (D.C. Cir. 2020) ..................................................29, 32, 33

*City of Houston v. Dep't of Hous. & Urb. Dev.,*
24 F.3d 1421 (D.C. Cir. 1994) ..............................................................35

*Comm. on Judiciary v. Miers,*
558 F. Supp. 2d 53 (D.D.C. 2008) ........................................................36

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
603 U.S. 799 (2024) ..................................................................27, 29, 30

*Del Monte Fresh Produce Co. v. United States,*
570 F.3d 316 (D.C. Cir. 2009) ..............................................................35

*Durovic v. Richardson,*
479 F.2d 242 (7th Cir. 1973) ................................................................13

*Edwards v. District of Columbia,*
755 F.3d 996 (D.C. Cir. 2014) ..............................................................31

*Functional Music, Inc., v. FCC,*
274 F.2d 543 (D.C Cir 1958) ................................................................29

*Genesis Healthcare, Inc. v. Becerra,*
39 F.4th 253 (4th Cir. 2022) ................................................................35

*Genuine Parts Co. v. EPA,*
890 F.3d 304 (D.C. Cir. 2018) ........................................................29, 33

---

[*]    Authorities marked with an asterisk are those on which we chiefly rely.

**Cases—continued**

*Humane Soc'y v. Zinke,*
  865 F.3d 585 (D.C. Cir. 2017) ................................................................30

*Jafarzadeh v. Nielsen,*
  321 F. Supp. 3d 19 (D.D.C. 2018) ..........................................................30

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
  478 U.S. 221 (1986) ...............................................................................27

*Kingdomware Techs., Inc. v. United States,*
  579 U.S. 162 (2016) ...............................................................................25

*Kisor v. Wilkie,*
  588 U.S. 558 (2019) ...............................................................................19

*Koi Nation of N. Cal. v. U.S. Dep't of Interior,*
  361 F. Supp. 3d 14 (D.D.C. 2019) ..........................................................34

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
  523 U.S. 26 (1998) .................................................................................25

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ...............................................................................14

*Lorillard v. Pons,*
  434 U.S. 575 (1978) ...............................................................................12

*Maine Cmty. Health Options v. United States,*
  590 U.S. 296 (2020) ..........................................................................17, 25

*Morton v. Mancari,*
  417 U.S. 535 (1974) ...............................................................................18

*Murphy Expl. & Prod. Co. v. U.S. Dep't of Interior,*
  270 F.3d 957 (D.C. Cir. 2001) ................................................................29

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) .........................................................30, 31

*Newport Pharms. Int'l Inc. v. Schweiker,*
  1981 WL 768924 (D.D.C. Dec. 2, 1981) .............................................13, 14

*NLRB Union v. FLRA,*
  834 F.2d 191 (D.C. Cir. 1987) ...........................................................29, 33

*Orion Reserves Ltd. P'ship v. Salazar,*
  553 F.3d 697 (D.C. Cir. 2009) ................................................................10

*Payne Enters., Inc. v. United States,*
  837 F.2d 486 (D.C. Cir. 1988) ................................................................35

*Rapanos v. United States,*
  547 U.S. 715 (2006) ..........................................................................15, 17

*Reno v. Flores,*
  507 U.S. 292 (1993) ...............................................................................31

*Republic of Sudan v. Harrison,*
  587 U.S. 1 (2019) ...................................................................................11

**Cases—continued**

*Sandoz, Inc. v Leavitt,*
  427 F. Supp. 2d 29 (D.D.C. 2006) ......................................1, 5, 17, 18, 19, 24, 25

*Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urban Dev.,*
  106 F.4th 1134 (D.C. Cir. 2024) ......................................................................20

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1994) ........................................................................................14

*Texas v. EPA,*
  726 F.3d 180 (D.C. Cir. 2013) .........................................................................10

*Tripoli Rocketry Ass'n, Inc. v. U.S. Bureau of Alcohol, Tobacco & Firearms,*
  2002 WL 33253171 (D.D.C. June 24, 2002) ...................................................30

*United States v. Bailey,*
  2023 WL 2139365 (D.D.C. Feb. 21, 2023) ......................................................20

*United States v. O'Brien,*
  391 U.S. 367 (1968) ........................................................................................16

*United States v. Salerno,*
  481 U.S. 739 (1987) ...................................................................................31, 32

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ........................................................................................18

*Vanda Pharms., Inc. v. FDA,*
  2024 WL 307387 (D.D.C. Jan. 26, 2024) ...............................................1, 9, 35

*Weaver v. Fed. Motor Carrier Safety Admin.,*
  744 F.3d 142 (D.C. Cir. 2014) .........................................................................29

**Statutes**

5 U.S.C.
  § 702 ................................................................................................................27
  § 704 ................................................................................................................27
  § 706 ..........................................................................................................30, 36
  § 706(1) ......................................................................................................30, 37
  § 706(2) ..............................................................................................30, 31, 34
  § 706(2)(A) .......................................................................................................30
  § 706(2)(C) ................................................................................................30, 31

21 U.S.C.
  § 355 ....................................................................................................21, 22, 25
  § 355(a) ..............................................................................................................3
  § 355(b) ......................................................................................................15, 21
  § 355(b)(1) ..........................................................................................10, 11, 14
  § 355(c) ......................................................................................4, 10, 13, 14, 18
  *§ 355(c)(1) ..........................1-3, 5, 6, 8-10, 12-19, 21, 24-26, 34, 36, 37
  § 355(d) ............................................................................................................24
  § 355(j)(5)(A) ...............................................................................................15, 25

**Statutes—continued**

21 U.S.C.—continued
§ 379h..................................................................................................17
§ 379h(a)..............................................................................................4
§ 379h(a)(1)(C).....................................................................................17
§ 379h(a)(1)(D).....................................................................................17
§ 379h(a)(1)(E).....................................................................................17
§ 379h(b)..............................................................................................23
§ 379h(c)..............................................................................................23
§ 379h(c)(3)(B).....................................................................................24
§ 379h(c)(3)(C).....................................................................................24

28 U.S.C.
§ 2201(a).........................................................................................34, 36
§ 2344..................................................................................................31
§ 2401(a)..............................................................................................27

35 U.S.C. § 156.........................................................................................15

Federal Food, Drug, and Cosmetic Act,
    Pub. L. No. 75-717, 52 Stat. 1040 (1938)..........................................11

Drug Amendments of 1962,
    Pub. L. No. 87-781, 76 Stat. 780 (Oct. 10, 1962)...........................13, 19

Drug Price Competition and Patent Term Restoration Act of 1984,
    Pub. L. No. 98-417, 98 Stat. 1585......................................................14

Prescription Drug User Fee Act of 1992,
    Pub. L. No. 102-571, 106 Stat. 4491.....................................................4

Prescription Drug User Fee Amendments of 2022,
    Pub. L. No. 117-180, tit. I, 135 Stat. 2140............................................4

**Regulations**

21 C.F.R.
§ 2.110 (1941).......................................................................................12
§ 130 (1962).........................................................................................12
§ 314.3(b)...............................................................................................6
§ 314.100(a)......................................................................6, 19, 28, 36, 37
§ 314.100(c)..........................................................................2, 5, 9, 19, 28
§ 314.101(a)..........................................................................................34
§ 314.101(a)(1).....................................................................................10
§ 314.101(a)(2)...................................................................1, 4, 9, 10, 36, 37
§ 314.110..........................................................................................2, 28
§ 314.110(a)..........................................................................................25
§ 314.110(b)......................................................................................6, 26
§ 314.110(b)(3)................................................................2, 6, 9, 26, 36, 37
§ 314.110(c)......................................................................6, 26, 28, 36, 37
§ 314.110(c) (1975)..............................................................................13
§ 314.110(c)(1).......................................................................................6

**Rules**

Promulgation of Regulations Under the Federal Food, Drug, and Cosmetic Act and
    Repeal of Certain Regulations Heretofore Promulgated Thereunder,
    3 Fed. Reg. 3,161 (Dec. 28, 1938) ...................................................................12, 17

Regulations for the Enforcement of the Federal Food, Drug, and Cosmetic Act;
    Amendments to the General Regulations Heretofore Promulgated,
    6 Fed. Reg. 1,920 (Apr. 15, 1941) ...........................................................................12

Procedural and Interpretative Regulations; Recodification of Part,
    21 Fed. Reg. 5,576 (July 25, 1956) ..........................................................................12

Reorganization and Republication,
    39 Fed. Reg. 11,680 (Mar. 29, 1974) ................................................................13, 17

New Drug and Antibiotic Regulations,
    47 Fed. Reg. 46,622 (proposed Oct. 19, 1982) .................................................13, 14

New Drug and Antibiotic Regulations,
    50 Fed. Reg. 7,452 (Feb. 22, 1985) ..................................................................13, 14

Applications for Approval to Market a New Drug; Complete Response Letter,
    73 Fed. Reg. 39,588 (July 10, 2008).............................................2, 5, 19, 36, 37

Prescription Drug User Fee Rates for Fiscal Year 2025,
    89 Fed. Reg. 61,474 (July 31, 2024) .........................................................................5

**Dictionaries**

*Agree*, Webster's Seventh New Collegiate Dictionary (1963) ......................................20

*Agreed*, Webster's New World Dictionary (1957) .........................................................20

*Agreement*, Black's Law Dictionary (4th ed. 1968) ......................................................20

*Agreement*, Webster's New Practical Dictionary 14 (1957)..........................................20

*File*, American Dictionary of the English Language (1828) .........................................11

*File*, Black's Law Dictionary (4th ed. 1968) ...............................................................11

*File*, The Oxford English Dictionary vol. IV (1933) ....................................................11

*File*, Webster's Third New International Dictionary (1986) .........................................11

*Mutual*, Black's Law Dictionary (4th ed. 1968) ..........................................................20

*Unilateral*, Black's Law Dictionary (4th ed. 1968).....................................................20

**Other Authorities**

138 Cong. Rec. 26,928 (Sept. 22, 1982).........................................................................4

2B Norman J. Singer et al., *Sutherland Statutes and Statutory Construction*
    (7th ed. Nov. 2024 upd.) .......................................................................................12

Chicago Manual of Style (15th ed. 2003) ......................................................................21

FDA, *CDER 21st Century Review Process Desk Reference Guide*
    (as of July 11, 2023)................................................................................................5

FDA, *Minutes of FDA-Industry PDUFA VII Reauthorization Meeting, FDA and*
    *Industry Finance Group* (Jan. 13, 2021).................................................................23

**Other Authorities—continued**

FDA, *Minutes of FDA-Industry PDUFA VII Reauthorization Meeting, FDA and Industry Finance Group* (Jan. 14, 2021)......................................................................23

FDA, *PDUFA VII: Fiscal Years 2023-2027* (Apr. 24, 2023).......................................21

FDA, *PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2023 Through 2027* (as of May 15, 2024) ..........................................................5

FDA, *Prescription Drug User Fee Act (PDUFA) Reauthorization: FDA and Industry Negotiation Steering Committee* (Feb. 12, 2021), https://www.fda.gov/media/147048/download?attachment ...................................22

FDA, *Public Meeting on Prescription Drug User Fee Act (PDUFA) Reauthorization* (July 23, 2020) ...........................................................................21

FDA, *Public Meeting on Prescription Drug User Fee Act (PDUFA) Reauthorization* (July 23, 2020) ...........................................................................22

FDA, *Public Stakeholder Meeting on Prescription Drug User Fee Act (PDUFA) Reauthorization* (Sept. 25, 2020).........................................................................23

H.R. Rep. No. 98-857, pt. 1, 1984 U.S.C.C.A.N. 2,647 ...............................................16

Proposal to Refuse to Approve a New Drug Application for Tradipitant; Opportunity for a Hearing, 90 Fed. Reg. 4,748 (Jan. 16, 2025) ...........................8

Restatement (Second) of Contracts (1981)...................................................................20

Vanda Pharmaceuticals Inc. Form 10-K (2024) ..........................................................22

Walt Williams, *PhRMA Adopts New Membership Criteria, Forcing Companies out of Group*, CEO Update (May 10, 2017) ..................................................22

## GLOSSARY OF ABBREVIATIONS

**ANDA:**  abbreviated new drug application

**APA:**  Administrative Procedure Act

**CDER:**  FDA's Center for Drug Evaluation and Research

**CRL:**  complete response letter

**FDA:**  Food and Drug Administration

**FDCA:**  Federal Food, Drug, and Cosmetic Act

**NDA:**  new drug application

**NOOH:**  Notice of an opportunity for a hearing (21 U.S.C. § 355(c)(1)(B))

**sNDA:**  supplemental new drug application

**PDUFA:**  Prescription Drug User Fee Act

## INTRODUCTION

The timely processing of applications to market new drugs is critical.  For American patients, timely review ensures that safe and effective medicines reach those whose lives may be transformed—if not saved—by new therapeutics.  For drug innovators, who virtually always hold patents with limited temporal duration, it is essential to make a return off the staggering investment necessary to bring a drug to market.  Congress recognized the importance of timely review of drug applications in the Federal Food, Drug, and Cosmetic Act (FDCA), which requires FDA to act on a new drug application within 180 days by approving the application or providing a notice of opportunity for a hearing (NOOH) on the approvability of the application.  21 U.S.C. § 355(c)(1).

This action stems from FDA's persistent refusal to follow the timetable set forth by Congress.  Despite courts' continued skepticism of FDA's position (*see Sandoz, Inc. v Leavitt*, 427 F. Supp. 2d 29, 35-37 (D.D.C. 2006); *Vanda Pharms., Inc. v. FDA*, 2024 WL 307387 (D.D.C. Jan. 26, 2024)), FDA persists in applying its unlawful rules to Vanda's application.  FDA unlawfully delayed action on Vanda's supplemental new drug application (sNDA) for Hetlioz® related to the treatment of jet lag.  *Vanda Pharms.*, 2024 WL 307387, at *3-6.  Then, it unlawfully delayed action on Vanda's supplemental new drug application for Hetlioz® to treat insomnia—a matter separately before the Court.  Now, FDA has applied its unlawful rules to once again delay action on Vanda's applications to market tradipitant for gastroparesis and motion sickness.

Congress bestowed on drug innovators a clear statutory right: FDA must act on an NDA or sNDA within 180 days of the applicant's filing by taking one of two actions: approving the application or providing an NOOH.  21 U.S.C. § 355(c)(1).  FDA does neither.  Instead, FDA has created a system that routinely violates innovators' rights under Section 355(c)(1).

*First*, an FDA regulation—the "60-Day Filing Regulation"—allows the agency to determine whether an application may be "filed" and deems the "date of filing" to be "60 days after the date FDA received the NDA."  21 C.F.R. § 314.101(a)(2).  This regulation conflicts with Section

355(c)(1)—and decades of predecessor agency regulations—under which the date that triggers Section 355(c)(1)'s 180-day clock is the date the *applicant* submits the application. This regulation thus adds 60 days to the statutorily-mandated approval period.

*Second*, through its "Industry Agreement Rule," FDA has wholesale altered the 180-day (roughly 6-month) statutorily-mandated timeframe with a longer period of its choosing—10 months for supplemental new drug applications (sNDAs) and 12 months for new drug applications (NDAs). FDA contends that there is supposedly an industrywide "agreement" to extend the review period to match the date FDA selected under the Prescription Drug User Fee Act (PDUFA). *See* Applications for Approval to Market a New Drug; Complete Response Letter, 73 Fed. Reg. 39,588, 39,589 (July 10, 2008). FDA then asserts that this qualifies as a "mutual agreement" between FDA and *all* drug sponsors, thus triggering the provisions of the statute and 21 C.F.R. § 314.100(c) that allow for extended periods of time upon an applicant's agreement. This is flatly wrong: FDA cannot declare that *every* applicant—and certainly not Vanda—has *agreed* to waive its statutory rights to a 180-day review period. FDA cannot erase Vanda's statutory rights in this manner.

*Third*, via the "Complete Response Letter Regulation" (21 C.F.R. § 314.110), a new drug applicant cannot obtain a notice of an opportunity for a hearing within 180 days. When FDA intends not to approve an application, it sends a complete response letter on day 180 (or, really, on the much-later PDUFA date); requires the applicant to request the statutory notice after receiving the complete response letter; and then delays another 60 days in sending the notice (21 C.F.R. § 314.110(b)(3)). This structure delays the NOOH pathway until at least day 240, well beyond Section 355(c)(1)'s 180-day timeframe.

In total, the FDCA provides that, from when an applicant submits an NDA or an sNDA, FDA must provide either an approval or an NOOH within 180 days. But the Rules FDA has erected wholesale displace this framework. Instead, for an NDA, an applicant cannot receive an NOOH in less than 14 months (the 12 month PDUFA period plus the 2 months for the NOOH);

for an sNDA, FDA takes at least 12 months.

None of these Rules is lawful. All of them harm and will continue to harm Vanda. These Rules are in fact actively harming Vanda. Vanda submitted its motion-sickness NDA on December 30, 2024, an application for which the statute requires FDA action by June 28, 2025. FDA, however, has acted as though it is business as usual and applied each of the unlawful Rules to the motion-sickness NDA. Vanda thus asks that the Court hold unlawful and set aside each of FDA's Rules—the 60-Day Filing Regulation, the Industry Agreement Rule, and the Complete Response Letter Regulations—that contributes to the guaranteed delay inconsistent with the FDCA and confirm that FDA's deadline to act on Vanda's motion-sickness NDA is **June 28, 2025**.

## BACKGROUND

### A.    FDA's statutory duty to act on new drug applications

The FDCA conditions the introduction of "any new drug" into interstate commerce on approval by FDA. 21 U.S.C. § 355(a). To obtain approval for a new drug, a drug sponsor must submit a new drug application (NDA) to FDA.[1] Once FDA has approved an NDA for a new drug, the manufacturer may lawfully market the drug for the use specified in the FDA-approved label (or in FDA terms, the "indication").

The FDCA sets specific deadlines for FDA's review of NDAs and sNDAs. Specifically, the statute provides that "[w]ithin one hundred and eighty days after the filing of an [NDA], … the [FDA] shall either—(A) approve the application ... or (B) give the applicant notice of an opportunity for a hearing." 21 U.S.C. § 355(c)(1). The statute recognizes one exception to the 180-day timeframe: where an "additional period" is "agreed upon by the Secretary and the applicant." *Id.* The statute thus sets a mandatory timeframe within which FDA must either approve the application or—if it has substantive reservations—permit the applicant to make its best case for approvability

---

[1]    For substantial amendments to approved drugs, like approving a new use, sponsors submit a supplemental new drug application (sNDA). Except where specifically noted, the statute and regulations treat NDAs and sNDA similarly in terms of approval timelines and processes.

to the ultimate agency decision-maker in a hearing.

### B.    FDA's contrary Rules

Despite the clear statutory directive that FDA either approve the application or provide notice of an opportunity for a hearing within 180 days, FDA regulations chart a different course.

#### 1.    The 60-Day Filing Regulation

First, FDA gives itself 60 days at the beginning of the review process to determine whether an application can be deemed "filed."  Instead of considering an NDA or sNDA filed on the date the applicant submits it, and FDA receives it, FDA instead deems NDAs filed "60 days after the date FDA received the NDA."  21 C.F.R. § 314.101(a)(2).  If FDA determines the application is complete enough to permit substantive review by the agency, FDA starts the 180-day clock.  *See id.* § 314.101(a)(1), (2) ("The date of filing will be the date 60 days after the date FDA received the NDA.  The date of filing begins the 180–day period described in section 505(c) of the Federal Food, Drug, and Cosmetic Act.").

#### 2.    The Industry Agreement Rule

Once FDA deems an application "filed" (albeit belatedly), FDA then structures its review of new drug applications around an entirely non-statutory set of deadlines: its PDUFA goals. Through the Prescription Drug User Fee Act of 1992, Pub. L. No. 102-571, 106 Stat. 4491, and in an effort to course-correct FDA's abysmal delays, Congress empowered FDA to "assess and collect fees" (*see* 21 U.S.C. § 379h(a)) that would be "dedicated toward expediting the review of human drug applications" (Pub. L. No. 102-571 § 102; 138 Cong. Rec. 26,928 (Sept. 22, 1982)). Over the years, Congress has reauthorized the funding mechanism: FDA has continued to send letters with its "goals" to Congress, and Congress has reauthorized the agency to collect user fees expressly dedicated to expediting review.  *See, e.g.*, Prescription Drug User Fee Amendments of 2022, Pub. L. No. 117-180, tit. I, § 1001(b), 135 Stat. 2140.  These fees are substantial: The PDUFA fee for a new drug application requiring review of clinical data is $4,310,002 for fiscal

year 2025. Prescription Drug User Fee Rates for Fiscal Year 2025, 89 Fed. Reg. 61,474, 61,480 (July 31, 2024).

After a court in this District held that PDUFA did not impliedly repeal the timing obligation of Section 355(c)(1) (*see Sandoz*, 427 F. Supp. 2d at 35-37), FDA invented the "Industry Agreement Rule"—a rule that treats PDUFA as an industrywide agreement to extend the review period for *all applicants* to match FDA's PDUFA goal date and to interpret the agency's regulations as incorporating such agreement. *See* Applications for Approval to Market a New Drug; Complete Response Letter, 73 Fed. Reg. 39,588, 39,589 (July 10, 2008) ("Adjustment of the initial review cycle to fewer or greater than 180 days for human drug applications and supplements, accepted by mutual agreement between industry and FDA under the agency's user fee performance goals, is provided for under the adjustment by mutual agreement provision in revised § 314.100(c).").

FDA's performance "goal" under PDUFA for a standard NDA is to "[r]eview and act on 90 percent of [applications] within 10 months of the 60-day filing date." FDA, *PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2023 Through 2027* 4 (as of May 15, 2024), perma.cc/FG94-7FDV. That is, FDA's own "goal" for responding to NDAs is 365 days (10 months, plus 60 days from when the applicant submits the NDA) or *double* the amount of time that Section 355(c)(1) mandates. Indeed, FDA manuals instruct employees to structure their review around the PDUFA schedule, not the statutory timeline. *See* First Amended Complaint (FAC) Ex. 1, FDA, *CDER 21st Century Review Process Desk Reference Guide* 1, 6 (as of July 11, 2023), perma.cc/NQ4F-G7GG (noting "Month 10" as the "action date" for applications). As a result of FDA's Industry Agreement Rule, FDA takes at least 10 months for every sNDA and 12 months for every NDA and contends that this timeline is authorized because of the alleged "mutual agreement between industry and FDA." 73 Fed. Reg. at 39,589.

### 3.    The Complete Response Letter Regulations

Once FDA completes its initial review, it then supplants the statutory NOOH with the

complete-response-letter process.  Under FDA's CRL regulations, "within 180 days of receipt of an application"—the same 180 days the statute contemplates—"FDA will review it and send the applicant either an approval letter … or a complete response letter."  21 C.F.R. § 314.100(a).[2]  A complete response letter is "a written communication to an applicant from FDA usually describing all of the deficiencies that the Agency has identified in an NDA [or sNDA] … that must be satisfactorily addressed before it can be approved."  *Id.* § 314.3(b).  Although a complete response letter contains high-level summaries of FDA's reasons why it will not immediately approve the application, FDA contends that a complete response letter is not a notice of an opportunity for a hearing.  *Id.* § 314.110(b)(3) (instituting another process to obtain an NOOH).  *Contra* 21 U.S.C. § 355(c)(1) (requiring either approval or a notice of opportunity for hearing).

FDA regulations further purport to suspend the statutory 180-day deadline during any period after the agency sends the applicant the complete response letter and before the applicant takes one of a list of specified actions, including formally requesting an opportunity for a hearing.  21 C.F.R. § 314.110(b), (c).  And the same regulation declares unilaterally that "[a]n applicant *agrees* to extend the review period under [21 U.S.C. § 355(c)(1)] until it takes" one of these three actions after receiving a CRL, regardless of whether there is any real agreement reached between FDA and an applicant.  21 C.F.R. § 314.110(c)(1) (emphasis added).

FDA then allots itself 60 more days to issue the NOOH.  21 C.F.R. § 314.110(b)(3).  Specifically, FDA regulations provide that once the applicant requests an opportunity for a hearing, FDA "will either approve the application … or refuse to approve the application … and give the applicant written notice of an opportunity for a hearing"—the statutory NOOH—"[w]ithin 60 days of the date of the request for an opportunity for a hearing."  *Id*.  The regulations provide no means

---

[2]    Although the CRL regulations state that FDA will issue an approval or complete response letter within 180 days of receipt of an application (21 C.F.R. § 314.100(a)), FDA does not follow that timeframe.  As explained above (at 4-5), FDA instead takes action on the PDUFA goal date— which is currently 12 months after receipt of an NDA and 10 months after receipt of an sNDA.

for the applicant to avoid being channeled into this procedure: an applicant cannot opt out before a CRL issues, it cannot withhold consent to the extension, and even if the applicant requests an opportunity for a hearing immediately upon issuance of a complete response letter, FDA still takes 60 days to provide it.

### C.    FDA's delay of Vanda's tradipitant NDAs using the Rules

Vanda develops and markets innovative pharmaceutical products to address high-impact unmet patient needs.  One such drug is tradipitant.  Tradipitant has been studied for more than 20 years, first by Eli Lilly and, since 2012, by Vanda. Tradipitant is a therapeutic agent that blocks the body's neurokinin 1 receptors; as such, it has the potential to treat a variety of conditions.  First Amended Complaint (FAC) ¶ 9.

FDA has used the Rules to delay two of Vanda's tradipitant applications, with Vanda's motion sickness NDA already primed to miss the statutory deadline of June 28, 2025.

**1.**    Vanda submitted NDA No. 218489 for tradipitant to treat gastroparesis on September 18, 2023.  Gastroparesis NDA Cover Letter (JA__).[3]  The NDA is the product of years of hard work, research, and development—including two double-blind, placebo-controlled clinical studies of adults with diabetic or idiopathic gastroparesis.  As with Vanda's prior applications, FDA applied its unlawful rules to delay action on the gastroparesis NDA.  FDA deemed the application "filed" 60 days after it was received, and FDA applied its Industry Agreement Rule to delay action on the NDA until September 18, 2024—six months late.  Gastroparesis NDA Filing Review Letter (Dec. 1, 2023) (JA__); Gastroparesis NDA CRL (Sept. 18, 2024) (JA__).  Rather than issue a notice of opportunity for hearing on the action date, FDA instead issued a complete response letter and applied those regulations to delay issuing a private notice of opportunity for a hearing until January 7, 2025—477 days after the NDA was filed.  Gastroparesis NDA CRL (JA__);

---

[3]    FDA will produce an administrative record on April 28.  Vanda will file the joint appendix and an updated version of this brief with administrative record citations on or before May 19.  Dkt. 16.

Gastroparesis NDA NOOH (JA__); *see also* Proposal to Refuse to Approve a New Drug Application for Tradipitant; Opportunity for a Hearing, 90 Fed. Reg. 4,748 (Jan. 16, 2025) (public NOOH). Vanda timely accepted its hearing on January 26, 2025. Now, 569 days after Vanda first filed its application, FDA still has not scheduled a hearing.

**2.** Vanda submitted NDA No. 220152 seeking approval of tradipitant capsules for the acute prevention of vomiting induced by motion in adults (i.e., motion sickness) on December 30, 2024. Motion Sickness NDA Cover Letter (JA__). Vanda supported the motion sickness NDA with the results from three adequate and well-controlled studies in adults with a history of motion sickness, each of which showed a statistically significant improvement for patients taking tradipitant over placebo. *Id.* (JA__); *see* FAC ¶¶ 70-72.

FDA acknowledged Vanda's NDA by letter on January 22 and noted the "date of application" and "date of receipt" as December 30, 2024. Motion Sickness NDA Filing Acknowledgement Letter (Jan. 22, 2025) (JA__). But, relying on its 60-Day Filing Regulation, FDA informed Vanda that it would not "file" the application until February 28, 2025, if it deems the application sufficiently complete. *Id.*

Vanda received another letter from FDA on March 14 confirming that the motion sickness NDA was "considered filed 60 days after the date [FDA] received [the] application" because of the 60-Day Filing Regulation. Motion Sickness NDA Filing Review Letter (Mar. 14, 2025) (JA__). FDA further stated that its "goal date" for acting on this NDA is December 30, 2025 (*id.*)—365 days after Vanda filed its application—not June 28, 2025, which is 180 days after Vanda filed the application (21 U.S.C. § 355(c)(1)). FDA emphasized that Vanda's motion sickness NDA is "subject to the provisions of 'the Program' under the Prescription Drug User Fee Act (PDUFA) VII"—confirming that FDA is applying that Program—the Industry Agreement Rule—and the accompanying extended review timetable to Vanda's motion-sickness NDA. *Id.* (JA__). FDA is thus once again using its unlawful rules to delay action on Vanda's NDA.

## ARGUMENT

Partial summary judgment for Vanda is warranted because FDA's Rules conflict with the governing statute, and FDA has applied those Rules to unlawfully delay action on Vanda's pending new drug applications. By purporting to allow the agency to avoid its statutory deadline for action, the Rules conflict with the statute and are therefore a nullity. This Court should declare these Rules unlawful and set them aside.

### A.    FDA's Rules are unlawful.

After an applicant submits an NDA, the FDCA obligates FDA to take one of two actions within 180 days—approve the application or provide the applicant a notice of opportunity for a hearing (or NOOH), unless the applicant and FDA agree otherwise.

By rule, FDA violates this statutory mandate in three key ways. First, through the 60-Day Filing Regulation, FDA gives itself an extension at the beginning of the process by not deeming an application "filed" until 60 days after FDA receives it. 21 C.F.R. § 314.101(a)(2). FDA then turns 180 days (roughly six months) into 10 or 12 months of review time by treating the agency's PDUFA goals as an industry wide "agreement" to extend the review period through the Industry Agreement Rule. 21 U.S.C. § 355(c)(1); 21 C.F.R. § 314.100(c). Finally, FDA's CRL Regulations supplant the agency's statutory obligation to provide the NOOH with a procedure of the agency's own making. Instead of an NOOH, FDA provides a CRL on the PDUFA date; once a CRL issues, the regulation dictates that the applicant "agrees" to extend the review period until the applicant requests that the agency issue the NOOH (21 C.F.R. §§ 314.110(c)(1), 314.110(b)(3)), and FDA then takes another 60 days to issue a "private" NOOH (*id.* § 314.110(b)(3)).[4] Collectively, although the statute provides FDA 180 days from submission to NOOH, FDA's Rules operate such that it takes, at the very least, 14 months (for an NDA) and 12 months (for an sNDA) to

---

[4]    FDA then delays *publishing* the NOOH in the *Federal Register* to avoid triggering the statutory deadlines attendant the hearing process. *See* FAC ¶¶ 44 (collecting examples), 46-48; *Vanda Pharms.*, 2024 WL 307387, at *4.

get from filing to NOOH.

No part of this regulatory scheme is consistent with the clear, mandatory timelines for reviewing NDAs that Congress set by statute. "[A] regulation contrary to a statute is void." *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009); *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013) ("A valid statute always prevails over a conflicting regulation, and a regulation can never trump the plain meaning of a statute.") (cleaned up). The Court should hold the Rules unlawful.

### 1.    *FDA's 60-Day Filing Regulation is inconsistent with the statute.*

FDA's 60-Day Filing Regulation, purporting to give the agency an additional 60 days to determine whether an application can be deemed "filed" (*see* 21 C.F.R. § 314.101(a)(2)), is inconsistent with the plain text of the FDCA.

The statute provides that "[a]ny person may file with the Secretary an application with respect to any drug." 21 U.S.C. § 355(b)(1). The statute then directs that "[w]ithin one hundred and eighty days after *the filing* of an application under subsection (b) … the Secretary *shall* either —(A) approve the application … or (B) give the applicant notice of an opportunity for a hearing." *Id.* § 355(c)(1) (emphasis added). The only exception to this deadline is when an "additional period" is "agreed upon by the Secretary and the applicant." *Id.*

FDA regulations, however, provide that an NDA (or sNDA) is not "filed" when the FDA receives it; rather, the agency has "60 days" from receipt to "determine whether the NDA may be filed." 21 C.F.R. § 314.101(a)(1). If the FDA deems the application sufficiently complete to be filed, the "date of filing will be the date *60 days after* the date FDA received the NDA." *Id.* § 314.101(a)(2) (emphasis added). Per FDA, this new "filing" date "begins the 180–day period described in [21 U.S.C. § 355(c)] of the Federal Food, Drug, and Cosmetic Act." *Id.*

**a.** The plain meaning of the term "file" supports Vanda's reading of the statute. When interpreting statutes, the court "begin[s] 'where all such inquiries must begin: with the language

of the statute itself.'" *Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019) (quoting *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012)). The term "file" in this context most naturally means—and has meant over the near-century since its first use in the FDCA in 1938 (*see* Federal Food, Drug, and Cosmetic Act, Pub. L. No. 75-717, 52 Stat. 1040 (1938))—"to place (a document) in a due manner among the records of a court or public office." *File*, The Oxford English Dictionary vol. IV, p.211 (1933);[5] *see also File*, Black's Law Dictionary (4th ed. 1968) ("To deliver an instrument or other paper to the proper officer for the purpose of being kept on file by him in the proper place"; "'To file' a paper, on the part of a party, is to place it in the official custody of the clerk."); *File*, Webster's Third New International Dictionary 849 (1986) ("to deliver (as a legal paper or instrument) after complying with any condition precedent (as the payment of a fee) to the proper officer for keeping on file or among the records of his office."); *accord File*, American Dictionary of the English Language (1828) ("To present or exhibit officially, or for trial; as, to *file* a bill in chancery.").[6]

Critically, under the statute, it is the *applicant*—not FDA—that files the application. The statute provides that "[a]ny person may file with the Secretary an application with respect to any drug." 21 U.S.C. § 355(b)(1). In establishing the governing dates, Congress surely understood that it was the *applicant*'s action that mattered—not FDA's. The statute makes no mention of any procedure by which the Secretary determines whether or not an application "may be filed" before the 180-day review period begins.

The agency's historical regulations confirm Vanda's reading of the text. For decades, FDA could reject incomplete filings, but its regulations treated complete applications as "filed" on the date the application was "received." This was FDA's consistent interpretation from 1938 until revisions to the regulations in the 1980s.

---

[5]    Available at https://archive.org/details/in.ernet.dli.2015.147245/page/n209/mode/2up.

[6]    Available at https://webstersdictionary1828.com/Dictionary/file.

- **1938:** "An application which is on its face incomplete … shall not be accepted for filing[.] … Otherwise, the date on which an application is received by the Department shall be considered to be the date on which such application is filed."  Promulgation of Regulations Under the Federal Food, Drug, and Cosmetic Act and Repeal of Certain Regulations Heretofore Promulgated Thereunder, 3 Fed. Reg. 3,161, 3,168 (Dec. 28, 1938) (implementing Section 505(b)).

- **1941**: "An application … which on its face is incomplete … shall not be accepted for filing[.] … Otherwise, the date on which an application is received by the Agency shall be considered to be the date on which such application is filed."  Regulations for the Enforcement of the Federal Food, Drug, and Cosmetic Act; Amendments to the General Regulations Heretofore Promulgated, 6 Fed. Reg. 1,920, 1,921 (Apr. 15, 1941) (prior 21 C.F.R. § 2.110 (1941)).

- **1956:** "An application shall not be considered complete and will not be filed … if it is incomplete on its face[.] … Otherwise, the date on which an application is received will be considered to be the date on which such application is filed."  Procedural and Interpretative Regulations; Recodification of Part, 21 Fed. Reg. 5,576, 5,579 (July 25, 1956) (prior 21 C.F.R. § 130 (1962)).

When Congress amended Section 355(c)(1) in 1962 to require FDA to act on an application within 180 days of a *filing*, it thus acted against the backdrop of FDA's consistent position that a complete application is "filed" when the agency receives it.  *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see also* 2B Norman J. Singer et al., *Sutherland Statutes and Statutory Construction* § 49:8 (7th ed. Nov. 2024 upd.) ([A] legislature is familiar with a contemporaneous interpretation, especially by the agency or executive officer charged to administer or enforce a statute, and therefore impliedly adopts the interpretation upon reenactment.").

FDA, once again, confirmed this understanding in its regulations post-dating 1962:

- **1974:** If the application is incomplete or inadequate, "[t]he applicant will be promptly notified of such nonacceptance and the reason therefor[.] … Otherwise, the date on which an application is received will be considered to be the date on which such application is filed, and the applicant will be notified of such date." Reorganization and Republication, 39 Fed. Reg. 11,680, 11,726 (Mar. 29, 1974) (prior 21 C.F.R. § 314.110(c) (1975)).

Section 355(c)'s relevant language has remained essentially unchanged since it was enacted in 1962. *See* Drug Amendments of 1962, Pub. L. No. 87-781, tit. 1, § 104(a), 76 Stat. 780, 784 (Oct. 10, 1962). The language of the statute is as plain as can be. Before Congress adopted the time limit in Section 355(c)(1), this is precisely how FDA construed the statutory term "filing." And, *after* Congress adopted Section 355(c)(1)'s timing provision, FDA maintained that same approach to "filing" via regulation. FDA had it right then.

**b.** FDA has cited various sources to suggest that Congress meant something else when it used the term "filing." None persuade.

**i.** FDA relies on *Newport Pharmaceuticals International Inc. v. Schweiker*, 1981 WL 768924 (D.D.C. Dec. 2, 1981) to bolster its position. *See* FDA Pre-Motion Notice 2, Dkt. 14 (citing *Newport*); *see also Durovic v. Richardson*, 479 F.2d 242, 245 (7th Cir. 1973). But these cases cannot bear the weight FDA gives them. As a factual matter, *Newport*'s description of FDA's practice as "consistently" placing the date of filing as some date other than FDA's receipt "since the original passage of the new drug application law in 1938" (1981 WL 768924 at *4) is flat wrong. *See supra* at 12-13. *Newport* predates FDA's 1985 promulgation of the 60-Day Filing Regulation—and even predates FDA's 1982 *proposal* to change the filing date. *See* New Drug and Antibiotic Regulations, 47 Fed. Reg. 46,622, 46,623 (proposed Oct. 19, 1982); New Drug and Antibiotic Regulations, 50 Fed. Reg. 7,452, 7,452 (Feb. 22, 1985). Regardless, as a legal matter, these cases gave "considerable deference" to FDA's "interpretation of … the statute under which

13

it operates." *Newport*, 1981 WL 768924 at *5.  This deference did not survive *Loper Bright Enterprises v. Raimondo*, which rejected the "misguided" presumption that "agencies have [any] special competence in resolving statutory ambiguities."  603 U.S. 369, 400-401 (2024).  And even if there were any room for FDA's 1985 views to shape the meaning of the statute, FDA's 1985 interpretation should get none of the weight that may still be owed to the "informed judgment of the Executive Branch" post-*Loper Bright* (*id.* at 369, 388), given its lack of "consistency with earlier … pronouncements" (*see supra* at 12-13), lack of "validity of its reasoning," and absence of "thoroughness evident in [FDA's] consideration."  *Id.* at 388 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1994)).

    **ii.**  FDA next contends that the Hatch-Waxman Amendments of 1984, in which Congress used the phrases "initially submitted" to address patent-term extensions and "initially received" to set the deadline for agency action on abbreviated new drug applications, somehow ratify FDA's current interpretation of Sections 355(b)(1) and 355(c).  That argument does not work.

    *First*, the Hatch-Waxman amendments did not amend Section 355(b)(1) or 355(c) in any way.  Moreover, at the time of Hatch-Waxman Amendments, the prevailing regulation—from 1974—did not deem the filing date to be 60 days later.[7]  The Hatch-Waxman Amendments therefore cannot be read as ratifying any then-existing understanding of Section 355(c)'s meaning.  Neither the patent-term extension provisions nor ANDA provisions were targeted at the timing for reviewing new drug applications.  They certainly cannot show that "Congress considered and rejected the '*precise* issue' presented" here—because they did not amend Section 355(c)(1) at all.  *See Rapanos v. United States*, 547 U.S. 715, 750 (2006).

---

[7]   By that point, FDA had only issued proposed regulations (in 1982).  New Drug and Antibiotic Regulations, 47 Fed. Reg. 46,622, 46,623 (proposed Oct. 19, 1982).  The final 60-Day Filing Regulation was not promulgated until 1985 (New Drug and Antibiotic Regulations, 50 Fed. Reg. 7,452, 7,452 (Feb. 22, 1985)), five months after the Hatch-Waxman Amendments were enacted on September 24, 1984 (Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585).

*Second*, the language used in the Hatch-Waxman Amendments is best understood as expressing frustration with FDA's delays and finding better language to cabin FDA.  The patent-term extension provision uses "initially submitted" to guide the calculation of patent-term-extensions to account for regulatory delays.  *See* 35 U.S.C. § 156.  There, Congress recognized that, even if FDA were to reject an application as incomplete for filing purposes, the delay in FDA making that decision should count in the patent-term extension calculation.  As for the timing of ANDA approvals, which Congress tethered to "receipt" of the application (21 U.S.C. § 355(j)(5)(A)), a better read of Congress's intention with that section is to indicate that Congress wanted FDA to begin the 180-day review period when it received the application for both NDAs and ANDAs all along.  *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 724-725 (D.C. Cir. 2022) (unenacted amendment clarifying disputed terms could suggest either that statutory provision in the Export Control Reform Act did not cover certain human rights abuses, or that Congress had wanted the provision to cover those abuses all along).  While Congress could have revised Section 355(c)(1) to match the language in Section 355(j)(5)(A), it is equally as likely that Congress enacted Section 355(j)(5)(A) to ensure the expediency for ANDAs that was meant to exist for NDAs too.  The divergence in possibilities is precisely why the Court should not place weight on the inaction of a subsequent Congress to divine the intent of a prior Congress from five decades prior.  *See Brecht v. Abrahamson*, 507 U.S. 619, 632 (1993) ("As a general matter, we are reluctant to draw inferences from Congress's failure to act.").

*Third*, FDA references a House Committee Report from the Hatch-Waxman Amendments. But this sheds no light on the interpretive question.  To start, this House Committee Report post-dates the enactment of the "filing" language in Section 355(b) by nearly 50 years and the enactment of the 180-day timeframe by more than 20 years—making it "not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 241-242 (2011) (critiquing the dissenting Justices' use of "a Committee Report by a later Congress" to bolster its interpretation because only

contemporaneous legislative history can "shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it").

In support of its argument that the separate, post-enactment provision in the Hatch-Waxman Amendments impacts the meaning of Section 355(c)(1), FDA commits another error in evaluating legislative history—it relies on the "minority views of Mr. Bliley" (H.R. Rep. No. 98-857, pt. 1, at 71, 73, 1984 U.S.C.C.A.N. 2,647, 2,681, 2,683). But "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). More, Mr. Bliley was commenting on FDA's slowness in completing the filing review for facial incompleteness. H.R. Rep. No. 98-857, pt. 1 at 73 n.*, 1984 U.S.C.C.A.N. at 2,683 n.21. He nowhere suggested FDA's practice was lawful. And, regardless, Mr. Bliley's minority views that "filing" and "receipt" meant something different were self-evidently not shared by others.

With respect to patent-term extension, the Committee on Energy and Commerce recognized that in FDA's review process "an application is often not considered to be filed, even though agency review has begun, until the agency has determined that no other information is needed and a decision on the application can be made." H.R. Rep. No. 98-857, pt. 1, at 44, 1984 U.S.C.C.A.N. at 2,677. Congress thus intentionally used the term "initially submitted" for purposes of calculating patent-term extensions attributable to regulatory delays. This is perfectly consistent with Vanda's position here: Vanda contends that Section 355(c)(1)'s 180-day clock is triggered by the date the applicant files the application. FDA's practice of refusing an incomplete application, however, does not undermine Vanda's contention—that FDA cannot add *time* onto the statutory 180 days for applications complete when filed. Through the patent-term extension discussion, the Committee at most acknowledged FDA's practice of refusing to file incomplete applications and intended to ensure that, if FDA used a refusal-to-file, the regulatory delay between filing and refusal-to-file counts towards patent-term extension calculations. It mentioned nothing about

changing the 180-day timeframe for resolving a complete application.

In all, such paltry evidence cannot displace "the plain text and original understanding" of Section 355(c)(1). *Rapanos*, 547 U.S. at 750.

**iii.** Finally, FDA points to the Prescription Drug User Fee Act, which generally recognizes that FDA refuses to file some new drug applications when they are incomplete. *See* 21 U.S.C. § 379h(a)(1)(C) (waiving the fee for a previous application that "was accepted for filing, and was not approved"); *id.* § 379h(a)(1)(D) (providing a refund seventy-five percent of the fee for an application "which is refused for filing or withdrawn without a waiver before filing"); *id.* § 379h(a)(1)(E) (requiring full fee for a resubmission or filing over protest on an application "that was submitted but was refused for filing, or was withdrawn before being accepted or refused for filing"). Once again, this subsequent enactment—decades later—sheds little light on the operation of Section 355(c)(1)'s 180-day deadline.

As we have explained, the refusal-to-file concept is nothing new. FDA could refuse to file incomplete applications by regulations dating back to 1938. Yet from 1938 to 1985, if an application *was* deemed sufficiently complete to permit substantive review, the filing date was the date that FDA received the application. *See* 3 Fed. Reg. at 3,168 ("An application which is on its face incomplete … shall not be accepted for filing …. Otherwise, the date on which an application is received by the Department shall be considered to be the date on which such application was filed."); 39 Fed. Reg. 11,680, 11,726 (Mar. 29, 1974) (same). The fact that Section 379h accepts the practice by which FDA reviews an application for completeness (and rejects those that are not complete) says nothing about the operative filing date that triggers the 180-day deadline for applications that arrive complete. It certainly lacks any of the type of language that would justify finding PDUFA to have repealed or amended Section 355(c)(1), when it plainly did not. *See Sandoz*, 427 F. Supp. 2d at 34-37; *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) ("Presented with two statutes, the Court will 'regard each as effective'—unless Congress's

17

intention to repeal is 'clear and manifest' or the two laws are 'irreconcilable.'") (quoting *Morton v. Mancari*, 417 U.S. 535, 550-551 (1974)).

In all, FDA's extra-statutory citations reveal a critical flaw in its argument. Nothing in the text of Section 355(c) gives FDA authority to set a specific period of time after the application is received for FDA to deem it "filed" for the purposes of the 180-day deadline. On its reading of the statute, FDA could have promulgated a rule giving it 30, 90, or 180 days to decide if an application is complete—limited only by what the FDA deems "reasonable." But nothing in the text gives FDA that authority. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) (recognizing the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate").

Section 355(c)(1) thus means what it says: applications are filed when the applicant submits them, not 60 days later. The most natural and unambiguous reading of the text of Section 355(c)(1) is that the 180-day period runs from the date the applicant provided the NDA to FDA. FDA's contrary 60-Day-Filing-Regulation, which extends this period an additional 60 days, is contrary to statute.

### 2.    *FDA's Industry Agreement Rule is unlawful.*

FDA further extends the 180-day deadline by the Industry Agreement Rule, under which it deems every drug sponsor to have "agreed" to have its applications decided on the PDUFA date.

A court in this District in 2006 roundly rejected the notion that PDUFA impliedly repealed Section 355(c)(1). *See Sandoz*, 427 F. Supp. 2d at 37 ("[T]he mere fact that the FDA sets its aspirations somewhere below what the statute requires is not reason enough to ease the statutory provision. The FDA must comply with the statute, not visa-versa."). FDA has abandoned that view—it "is not the position of the government" that "PDUFA implicitly repealed Section 355(c)(1)." FDA Opp. 25, No. 24-cv-351 (D.D.C. July 8, 2024), ECF No. 17.

FDA instead found a creative new way to circumvent *Sandoz*—by placing the "Industry

Agreement Rule" in a regulatory preamble.  On their face, FDA regulations suggest that FDA will take some action on a new drug application within 180 days of receipt.  21 C.F.R. § 314.100(a). But FDA does not act on day 180.  FDA instead applies the Industry Agreement Rule that treats PDUFA as an industrywide agreement to extend the review period to match FDA's PDUFA goal. *See* 73 Fed. Reg. at 39,589 ("Adjustment of the initial review cycle to fewer or greater than 180 days for human drug applications and supplements, accepted by mutual agreement between industry and FDA under the agency's user fee performance goals, is provided for under the adjustment by mutual agreement provision in revised § 314.100(c).").  Relying on the Industry Agreement Rule, FDA takes at least 10 months to act on sNDAs and 12 months to act on NDAs and then contends that this action is lawful because of the alleged "mutual agreement between industry and FDA" under 21 C.F.R. § 314.100(c).  *Id.*  That is exactly what FDA did here:  In setting the PDUFA goal date of December 30, 2025, for Vanda's motion sickness NDA, FDA candidly explained the NDA is "subject to the provisions of 'the Program' under the Prescription Drug User Fee Act (PDUFA) VII."  Motion Sickness NDA Filing Review Letter (Mar. 14, 2025) (JA__).

The Industry Agreement Rule is unlawful:  a prospective "industry agreement" cannot be squared with Section 355(c)(1)'s text, and, even if it theoretically could, FDA cannot show such agreement with "industry" anyway.

a.  Even taking it at face value, the Industry Agreement Rule cannot be squared with the text of Section 355(c)(1), which provides that the 180-day statutory review period on "an application" can be extended only for an "additional period … agreed upon by the Secretary *and the applicant*."  21 U.S.C. § 355(c)(1) (emphasis added);[8] Drug Amendments of 1962, Pub. L. No. 87-781, 76 Stat. at 784 (adding this language).

---

[8]    The regulation—21 C.F.R. § 314.100(c)—simply parrots Section 355(c)(1).  *See* 21 C.F.R. § 314.100(c) ("The initial review cycle may be adjusted by mutual agreement between FDA and an applicant …").  The Court's interpretive task is thus to interpret the statute.  *See Kisor v. Wilkie*, 588 U.S. 558, 578 n.5 (2019).

For two parties to have "agreed," it must be "settled or determined by mutual consent." *Agreed*, Webster's New World Dictionary 29 (1957);[9] *see also Agree*, Webster's Seventh New Collegiate Dictionary 19 (1963) ("to settle upon by common consent"; "AGREE implies unison or complete accord often after discussion or adjustment of differences");[10] *Agreement*, Webster's New Practical Dictionary 14 (1957) ("An exchange of promises; mutual understanding or arrangement.");[11] *Agreement*, Black's Law Dictionary (4th ed. 1968) ("A coming together or knitting together of minds; [t]he act of two or more persons, who unite in expressing a mutual and common purpose, with the view of altering their rights and obligations."). A federal agency's unilateral pronouncement that "[a]n applicant agrees" to something is not a manifestation of *mutual* assent; indeed, it is the definitional opposite. *Compare Mutual*, Black's Law Dictionary (4th ed. 1968) ("reciprocal; each acting in return or correspondence to the other; given and received"), *with Unilateral*, Black's Law Dictionary (4th ed. 1968) ("One-sided; ex parte; relating to only one of two or more persons or things"). Basic contract-law principles compel the same result. An "agreement" "requires a bargain in which there is a manifestation of mutual assent" (Restatement (Second) of Contracts § 17 (1981))—that is, it cannot be created by one party unilaterally—and cannot exist absent bargained-for consideration (*id.* § 71), which is also lacking here, where the applicant gains nothing from purportedly absolving FDA of its statutory deadline.

It is also "well established that the definite article 'the' particularizes the subject which it precedes." *Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urban Dev.*, 106 F.4th 1134, 1144 (D.C. Cir. 2024); *see also United States v. Bailey*, 2023 WL 2139365, at *5 (D.D.C. Feb. 21, 2023) ("Where used as an adjective, and in contrast to an indefinite article (e.g., 'a'), which 'points to nonspecific objects, things, or persons that are not distinguishable from the other members of a

---

[9]   https://archive.org/details/webstersnewworld0000nels/page/28/mode/2up.

[10]   https://archive.org/details/webstersseventhn0spri/page/18/mode/2up.

[11]   https://archive.org/details/webstersnewpract00spri/page/14/mode/2up.

class,' a definite article (e.g., 'the') speaks to something specific and distinct.") (quoting The Chicago Manual of Style §§ 5.70-71, 5.75, pp. 166-167 (15th ed. 2003)). When Section 355(c)(1) refers to "*the* applicant" having "agreed" with the Secretary, it can mean only the specific "person" filing "the application" under Section 355(b).

Here, Vanda is "the applicant" referenced in the statute. It is Vanda's application that is subject to being approved or rejected. And Vanda has never agreed to extend the agency's deadline. Thus, even if PDUFA could constitute the "agreement" referenced in Section 355(c)(1) between FDA and those members of industry that actually participated in the PDUFA process, Vanda did not participate in those negotiations and did not agree to extend the review deadline for any one of its applications. FDA's Industry Agreement Rule—which treats an amorphous "agreement" between FDA and the "industry" as an agreement by *all applicants*—is plainly invalid. "The pharmaceutical industry" writ large cannot "agree" to extend FDA's review deadline for Vanda's application. Nothing in Section 355 remotely suggests that some asserted understanding between FDA and "the pharmaceutical industry" can displace Vanda's specific, statutory right to have its application adjudicated within 180 days. Section 355(c)(1) addresses the relationship between FDA and the specific applicant—not the industry in general.

The process by which FDA supposedly enters "agreements" with the drug industry is troubling in its own right. Per available records from the PDUFA VII process (which FDA contends reflect the supposed agreement),[12] it appears that there is an "FDA and Industry Negotiation Steering Committee." All "Industry" members are affiliated with one of two trade associations—PhRMA or BIO.[13] Thus, it does not appear Vanda can even have its own seat at the table. What

---

[12]  *See* FDA, *PDUFA VII: Fiscal Years 2023-2027* (Apr. 24, 2023), https://www.fda.gov/industry/prescription-drug-user-fee-amendments/pdufa-vii-fiscal-years-2023-2027.

[13]  *See* FDA, *Public Meeting on Prescription Drug User Fee Act (PDUFA) Reauthorization* (July 23, 2020), https://www.fda.gov/media/140248/download (receiving "Regulated Industry Perspectives" from PhRMA and BIO),; FDA, *Prescription Drug User Fee Act (PDUFA) Reauthorization:*

is more, Vanda is ineligible to join PhRMA; PhRMA is explicitly only open to pharmaceutical giants—to be eligible, a company must spend $200 million in research and development each year.[14]  Vanda spends an enormous amount of its total budget on R&D—but in 2024, its *total* net product sales were $198.8 million.[15]  Vanda is thus not welcome to join PhRMA.  Nor is it clear that Vanda can join BIO.  And the implications of FDA's argument—that to even have a representative at the table, Vanda must join a voluntary trade association, pay that entity *enormous* dues, and be forced to subsidize a private advocacy organization's efforts with which Vanda may not agree, simply to interact with the FDA—is self-evidently improper.  And it easily dispenses with the notion that FDA's PDUFA "negotiations" create mutual agreement between an applicant and the Secretary to delay decision on a particular drug application.

      **b.**  Setting all that aside, there is also no evidence that "the pharmaceutical industry" "agree[s]" that FDA need not act on all new drug applications until the PDUFA goal date.[16]  FDA expressly provides as a "ground rule" during PDUFA reauthorization meetings that "policy issues are beyond the scope of the PDUFA reauthorization process."  FDA, *Public Meeting on Prescription Drug User Fee Act (PDUFA) Reauthorization* 5 (July 23, 2020), https://www.fda.gov/media/144611/download.  Instead, FDA forces Industry to discuss "desired enhancements" and takes off the table addressing FDA's "policy" of statutory noncompliance:

---

*FDA and Industry Negotiation Steering Committee* (Feb. 12, 2021), https://www.fda.gov/media/147048/download?attachment.

[14]  Walt Williams, *PhRMA Adopts New Membership Criteria, Forcing Companies out of Group*, CEO Update (May 10, 2017), tinyurl.com/5n7najdp.

[15]  Vanda Pharmaceuticals Inc. Form 10-K at 78 (2024), tinyurl.com/3s97ubsu.

[16]  That FDA does not dispute that Vanda did not participate in the PDUFA reauthorization negotiations (*see* FDA Remedies Br. 7, No. 24-cv-351 (D.D.C. Apr. 3, 2025), ECF No. 38) is reason alone to find in Vanda's favor without needing to address whether participation by *other* entities is relevant to the question of whether *those* entities agreed to extend the review time under Section 355.  The Court should nevertheless be skeptical of FDA's claim that the PDUFA negotiation process reflects a real "agreement" between any industry members and FDA to extend the review deadline for any particular new drug application for the reasons we explain.

> - Fee discussions with industry focus on desired enhancements in terms of specific aspects of activities in "process for the review of human drugs"
>   - What new or enhanced process will the FDA want or industry seek to include in the next 5 years?
>   - What is technically feasible?
>   - What resources are required to implement and sustain these enhancements?
>   - No discussion of policy.

FDA, *Public Stakeholder Meeting on Prescription Drug User Fee Act (PDUFA) Reauthorization* 9 (Sept. 25, 2020), https://www.fda.gov/media/144321/download?attachment. This means that the Industry Agreement Rule is out of bounds, and even someone who participates in the meeting process *could not* reject the Industry Agreement Rule deeming the final selected goals to be "agreed" extensions. That is not a "mutual agreement" in any sense.

The meeting minutes FDA points to (FDA Remedies Br. 7, No. 24-cv-351 (D.D.C. Apr. 3, 2025), ECF No. 38) do not reflect discussion or negotiation of the PDUFA timeframes, much less shortening them. *E.g.*, FDA, *Minutes of FDA-Industry PDUFA VII Reauthorization Meeting, FDA and Industry Finance Group* 1 (Jan. 13, 2021), https://www.fda.gov/media/147164/download?attachment (discussion of strategic hiring and financial transparency); FDA, *Minutes of FDA-Industry PDUFA VII Reauthorization Meeting, FDA and Industry Finance Group* 1 (Jan. 14, 2021), https://www.fda.gov/media/147168/download?attachment (clarification of certain fee exemptions). None of these documents include a so-called "unambiguous[] agree[ment]" (FDA Remedies Br., *supra*, at 7) that FDA could decide participants' applications (or all their members' applications) on the goal deadline rather than the statutory deadline.

At bottom, FDA has substantial authority to set its fee amount and determine its PDUFA "goal" deadlines. Although Congress determines some aspects of the fee calculation, FDA has discretion to "adjust" the "annual base revenue" amount upward "to reflect changes in the resource capacity needs of the Secretary for the process for the review of human drug applications." 21 U.S.C. §§ 379h(b)-(c). And while Congress requires that FDA adhere to a "capacity planning

methodology" (*id.* § 379h(c)(3)(B)) and sets a floor on the fee amount (*id.* § 379h(c)(3)(C)), Congress sets no maximum fee. If the now over $4,300,000 fee per application is insufficient to satisfy FDA's "resource capacity needs," FDA is free to, indeed, it must, raise the fee so it can meet its statutory obligations.

FDA's "Industry Agreement Rule" treats the PDUFA goals as an "agreement" by the industry writ large to extend the 180-day review period for Vanda's specific application. This is irreconcilable with Section 355(c)(1). *See Sandoz*, 427 F. Supp. 2d at 35-37. Any "agreement" to extend FDA's review period must be formed between the agency "and *the applicant*," here, Vanda (21 U.S.C. § 355(c)(1) (emphasis added)), not an agreement between the agency and "industry" generally or some members thereof.

### 3. FDA's CRL Regulations conflict with FDA's clear statutory obligations

After delaying action on an application until the PDUFA goal date, FDA's CRL Regulations build in yet more delay. The statute requires FDA to act on an NDA or sNDA within 180 days of the applicant's filing by either approving the application or providing a notice of opportunity for a hearing. 21 U.S.C. § 355(c)(1). But when the time comes for FDA to act, the agency never provides an NOOH on the deadline. Instead, through the CRL Regulations, FDA supplants its obligation to provide an NOOH and provides a CRL instead, uses the issuance of a CRL to create an "agreement" to extend deadlines until an applicant requests its statutory NOOH, and then takes an additional 60 days to provide the required NOOH. At the very fastest (assuming the Industry Agreement Rule were not applied), an applicant cannot obtain an NOOH until day 240, which conflicts with the clear mandate in Section 355(c)(1).

The FDCA unambiguously provides that "[w]ithin one hundred and eighty days after the filing of an application …, the Secretary *shall* either … (A) approve the application … or (B) give the applicant notice of an opportunity for a hearing before the Secretary under subsection (d) on the question whether such application is approvable." 21 U.S.C. § 355(c)(1) (emphasis added).

The only exception to the 180-day deadline is where an "additional period" is "agreed upon by the Secretary and the applicant." *Id.*

The word "'shall' is 'mandatory'" and "usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171-172 (2016) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)). In particular, "[w]hen a statute distinguishes between 'may' and 'shall'"—as Section 355 frequently does—"it is generally clear that 'shall' imposes a mandatory duty." *Id*. at 172; *see also Maine Cmty. Health Options*, 590 U.S. at 310 (statutory term "shall" is "mandatory language" that "typically creates an obligation impervious to discretion") (quotation marks omitted, alteration incorporated).

Reading the statute as Vanda does, another court in this District previously held that the FDCA's "180-day statutory provision imposes a mandatory obligation on the FDA," and as such, FDA is required "to take action on [an applicant's] NDA within 180 days of its filing." *Sandoz*, 427 F. Supp. 2d at 33, 38; *see also id.* at 34 (rejecting FDA's argument that PDUFA rendered the 180-day deadline "aspirational rather than mandatory"). Faced with identical statutory language elsewhere in Section 355, the D.C. Circuit has agreed, finding "the 180-day provision" of Section 355(j)(5)(A) to be "a facially mandatory statutory deadline" that FDA "violated" by failing to act on a generic drug application within that time. *In re Barr Lab'ys, Inc*., 930 F.2d 72, 74 (D.C. Cir. 1991).

FDA's CRL Regulations purport to extend the statutorily mandated deadline for providing either approval or a notice of opportunity for a hearing. Those regulations provide that, rather than giving the notice of opportunity for hearing required by statute, FDA instead "will send the applicant a complete response letter if the agency determines that [it] will not approve the application … in its present form." 21 C.F.R. § 314.110(a). The regulations then give the applicant three options: (1) "[r]esubmission" of the NDA, "addressing all deficiencies identified in the complete response letter"; (2) "[w]ithdrawal" of the application; or (3) the applicant must request the

opportunity for a hearing guaranteed by statute.  *Id*. § 314.110(b)(1)-(3).  And even when the applicant "request[s]" the "opportunity for a hearing," the regulations give FDA 60 *more* days before it must issue the notice of opportunity for a hearing.  *Id.* § 314.110(b)(3).  The regulations further assert that "[a]n applicant agrees to extend the review period under [21 U.S.C. § 355(c)(1)] until it takes any of the actions" just listed.  21 C.F.R. § 314.110(c)(1).

FDA's regulations are flatly inconsistent with the governing statute, which imposes a mandatory obligation on the agency to take a certain action (approve the NDA or issue a notice of an opportunity for hearing) within a specified time (180 days).  Nowhere does the statute mention the third option the FDA has invented, and FDA's inclusion in the regulations of at *least* 60 additional days of delay by requiring an applicant to "request" the opportunity for hearing is irreconcilable with the statutory scheme.  The regulation is therefore invalid.

Nor is the regulation's assertion that "[a]n applicant agrees to extend" FDA's statutory deadline "until [the applicant] takes" specified action (21 C.F.R. § 314.110(c)) a legitimate application of the statute's requirement that the deadline "shall" be either 180 days "or such additional period as may be agreed upon by the [FDA] and the applicant."  21 U.S.C. § 355(c)(1).  The clearest reason is that applicants have literally no way to avoid the deadline extension—they cannot opt out of the additional delay in advance of receiving a CRL.  As already explained above (*supra* at 20-21), an "agreement" requires some legitimate consent to the delay.  FDA's unilateral adoption of the CRL regulation cannot constitute an agreement between the FDA and "the applicant" to extend FDA's deadline to provide an NOOH.

### B.    Vanda is entitled to relief.

As we just established, applying the 60-Day Filing Regulation, Industry Agreement Rule, and CRL Regulations to Vanda's gastropareses NDA and to Vanda's motion sickness NDA violates Vanda's statutory rights to action within 180 days.  In light of these unlawful Rule applications, Vanda requests that the Court declare the 60-Day Filing Regulation, Industry Agreement

Rule, and CRL Regulations unlawful, and in particular, do so before FDA's statutory deadline to act on Vanda's motion sickness NDA—June 28, 2025.

### 1. *Vanda brought a timely post-application challenge to the Rules.*

These unlawful Rules have been applied to Vanda, contrary to its statutory rights, resulting in substantial unlawful delays in Vanda's NDA for tradipitant to treat motion sickness. And a long line of D.C. Circuit precedent has made abundantly clear that, when an agency takes a new action and applies its rules to regulated parties, that application is a new agency action that restarts the APA's statute of limitations.

The APA supplies a cause and right of action to plaintiffs aggrieved by certain agency actions. *See* 5 U.S.C. §§ 702, 704; *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 807 (2024); *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986). Section 2401(a) of Title 28 provides a statute of limitations within which a party can bring one of these actions—the "complaint [must be] filed within six years after the right of action first accrues." *Corner Post*, 603 U.S. at 808. As the Supreme Court recently confirmed, this "operates as a statute of limitations rather than a statute of repose," one that starts ticking when a plaintiff "suffers legally cognizable injury." *Id.* at 812, 816.

Vanda suffered legally cognizable injury when FDA applied the Rules to each of Vanda's tradipitant NDAs.

- 60-Day Filing Regulation:

    o FDA applied its 60-day Filing Regulation to the gastroparesis NDA by deeming it "filed" 60 days after Vanda submitted it. Gastroparesis NDA Filing Review Letter (Dec. 1, 2023) (JA__).

    o FDA applied its 60-Day Filing Regulation to the motion-sickness NDA by deeming the NDA "filed" 60 days after Vanda submitted it (Motion Sickness NDA Filing Acknowledgement Letter (Jan. 22, 2025) (JA__); Motion Sickness NDA Filing

Review Letter (Mar. 14, 2025) (JA__)).

- Industry-Agreement Rule:

  o FDA applied the Industry-Agreement Rule to the Gastroparesis NDA when it in-formed Vanda that the "goal date" for action on the application was September 18, 2024.  Gastroparesis NDA Filing Review Letter (Dec. 1, 2023) (JA__)

  o FDA applied the Industry Agreement Rule to the motion-sickness NDA when, on March 14, FDA stated that its "goal date" for acting on the NDA is December 30, 2025—365 days after Vanda submitted the application and confirmed that this date is because the NDA is subject to the "Program."  Motion Sickness NDA Filing Review Letter (Mar. 14, 2025) (JA__).

- CRL Regulations:

  o FDA applied the CRL Regulations to the Gastroparesis NDA when it issued a CRL to Vanda on September 18, 2024.  Gastroparesis NDA CRL (Sept. 18, 2024) (JA__).  In that letter, FDA applied its CRL Regulations by requiring Vanda to take one of the actions specified in 21 C.F.R. § 314.110, which is the regulation that dictates that "an applicant agrees to extend the review period under Section 505(c)(1)" until taking one of those actions.  *Id.* at 14; *see also* 21 C.F.R. § 314.110(c).[17]

  o FDA is applying the CRL Regulations to the motion-sickness NDA, as confirmed by FDA applying the Industry Agreement Rule of Section 314.100(c), rather than the timeframe of Section 314.100(a), and because FDA applies the CRL regulations to every application.

The D.C. Circuit has long held that a regulated party may challenge rules not just when

---

[17]  FDA has already issued a (late) NOOH for Vanda's gastroparesis NDA.  Vanda reserves the right to move for further relief, including for summary judgment, with respect to the timing of FDA's hearing on that NDA.

they are promulgated, but also when they are applied.  As that Court put it, when an agency applies its rules to a particular party, the party can "clearly challenge the validity of the regulation" on which the agency relied "even if that regulation went uncontested throughout the applicable statutory limitations period" for a facial challenge.  *NLRB Union v. FLRA*, 834 F.2d 191, 195 n.2 (D.C. Cir. 1987) (addressing a regulation); *see also Corner Post*, 603 U.S. at 809 n.2; *AT&T Co. v. FCC*, 978 F.2d 727, 734 (D.C. Cir. 1992) (addressing a substantive rule); *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014); *Genuine Parts Co. v. EPA*, 890 F.3d 304, 316 (D.C. Cir. 2018); *Functional Music, Inc.*, *v. FCC*, 274 F.2d 543 (D.C. Cir 1958).

FDA's applications of the Rules to Vanda's tradipitant NDAs are precisely the type of "application" of a rule to a particular party that gives rise to an application-based challenge. *Weaver*, 744 F.3d at 145-146 (rejecting the idea that only certain forms of agency "applications" are valid and discussing the contexts in which rules are "applied" to regulated parties such that a party may "challenge the validity of the regulation"); *accord Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 343 (D.C. Cir. 2020) (*CREW II*); *Murphy Expl. & Prod. Co. v. U.S. Dep't of Interior*, 270 F.3d 957, 957-959 (D.C. Cir. 2001); *Am. Scholastic TV Programming Found. v. FCC*, 46 F.3d 1173, 1178 n.2 (D.C. Cir. 1995) (parties may challenge regulations as exceeding statutory authority in "nonenforcement proceedings where the party is nevertheless harmed by application of the regulation").

Indeed, *Weaver* itself was brought in response to an agency's "failure to carry out its statutory duty."  744 F.3d at 147.  The D.C. Circuit rejected the government's argument that Weaver was "disguis[ing] the true nature of his attack on the rule … by purporting to attack the government's inaction," instead readily finding that Weaver *could* "draw the validity of the rule in question" in such a circumstance.  *Id.* at 145; *see also id.* at 146-147 ("Inaction, of course, can qualify as a form of agency action.").  And courts in this district have continued to permit *Weaver*-type challenges in circumstances similar to this case.  *E.g., Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19,

38, 41-42 (D.D.C. 2018) (applying the doctrine to review USCIS's memorandum establishing an application-review program, including substantive challenges to the program under the APA, when USCIS delayed action on plaintiffs' applications for lawful permanent residence by applying the program); *see also Tripoli Rocketry Ass'n, Inc. v. U.S. Bureau of Alcohol, Tobacco & Firearms*, 2002 WL 33253171, at *5 (D.D.C. June 24, 2002) (challenge was timely where the agency issued letters to plaintiffs that "indicated its intent to apply its regulation[s] ... to plaintiffs").

FDA has therefore applied its unlawful Rules to Vanda, and these applications give rise to a cause of action for Vanda to challenge *the Rules* as conflicting with the statute from which FDA's authority derives.

### 2.    The Court should vacate FDA's unlawful Rules.

The APA authorizes the Court to set aside rules when their validity is challenged through their application.  Section 706 directs the Court's review and remedies.  As to review, the court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  And, as to remedies, the Court "shall—

> (1) compel agency action unlawfully withheld or unreasonably delayed; *and*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be … not in accordance with law [or] in excess of statutory … authority.

5 U.S.C. § 706(1), (2)(A), (C) (emphasis added).

"[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated."  *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see Corner Post*, 603 U.S. at 830 ("Over the decades, [the Supreme Court] has affirmed countless decisions that vacated agency actions, including agency rules."); *accord Humane Soc'y v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017).  This relief is available whenever rules' invalidity is properly put before the Court—that is, Section 706(2) relief is available whether a plaintiff challenges the rule within the first six years of the rule's promulgation (or 60 days if 28

30

U.S.C. § 2344 applies), or within six years of an instance of an agency action applying that rule to the plaintiff. *AT&T*, 978 F.2d at 737.

FDA's suggestion that an application-based challenge requires Vanda to show something other than that the agency "excee[ded]" its "statutory authority" (5 U.S.C. § 706(2)(C))—i.e., to "establish that no set of circumstances exists under which the rule would be valid"—is both foreclosed by D.C. Circuit precedent and wrong on its own terms. *See* FDA Remedies Brief 6 n.2, No. 24-cv-351 (D.D.C. Apr. 3, 2025), ECF No. 38 (acknowledging that D.C. Circuit precedent forecloses FDA's position that vacatur is not an appropriate remedy in an APA case and that the *Salerno* test does not apply); *see Nat'l Min. Ass'n*, 145 F.3d at 1407 ("The Supreme Court has never adopted a 'no set of circumstances' test to assess the validity of a regulation challenged as facially incompatible with governing statutory law."). The standard FDA posits comes from *constitutional* challenges to agency action, not APA challenges alleging that the agency exceeded its statutory authority. *E.g.*, *Brennan v. Dickson*, 45 F.4th 48, 61 (D.C. Cir. 2022) (to establish a rule's invalidity *under the Fourth Amendment*, a plaintiff "must establish that no set of circumstances exists under which the [rule] would be valid"); *Reno v. Flores*, 507 U.S. 292, 300 (1993) (considering substantive and procedural due process challenge to INS regulation);[18] *Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014) (discussion of facial vs as-applied challenge to local D.C. regulation under the First Amendment). The D.C. Circuit observed this precisely in

---

[18]    In *Reno*, the plaintiffs brought three challenges—substantive and procedural due process, and an argument that the INS regulation exceeded the Attorney General's authority. 507 U.S. at 300. The Court said offhand that the "no set of circumstances" test applied to both the constitutional challenges and statutory challenge (*id.*), but when the Court arrived at the statutory argument, applied a different test—whether the regulation went "beyond the scope of the Attorney General's discretion to continue custody over arrested aliens" depended on whether the regulation had "a reasonable foundation … that is, if it rationally pursues a purpose that it is lawful for the INS to seek" (*id.* at 309). As Justice Alito pointed out, *Reno* (and the handful of cases like it that apply the "no set of circumstances" test to facial challenges) did not explain why that test should be applied, and "in neither case did the Court grapple with the question that has recently arisen regarding the scope of a court's authority under § 706(2) of the APA." *Bondi v. VanDerStok*, 604 U.S. ---, 2025 WL 906503, at *27 (Mar. 26, 2025) (Alito, J., dissenting).

*Brennan*, explaining that an as-applied versus facial distinction only has any conceivable relevance "[w]here a challenged rule *does not* exceed statutory authority and comports with the APA." 45 F.4th at 61 (emphasis added). This, of course, makes good sense. Courts do not redline rules to fit the statute; they set them aside. If the agency thinks it can write a rule that *does* comport with the statute, it can try again. Until then, the remedy is vacatur of the offending rule.

FDA's reliance on *Bondi v. VanDerStok*, 604 U.S. ---, 2025 WL 906503 (Mar. 26, 2025) is similarly misplaced. There, the Supreme Court explained that the plaintiffs had characterized their action as a "facial pre-enforcement challenge" to the regulation and the parties left the applicable standard—that "the plaintiffs' burden is to show that the Rule itself is inconsistent with the statute on its face"—undisputed. *Id.* at *5. The Court took "the parties' dispute as they have chosen to frame it" and left "for another day" the question of what "test courts should apply when a party contends that an agency has acted in excess of its statutory authority in a pre-enforcement challenge under the APA." *Id.* at *5 n.2. In dissent, Justice Thomas explained that the "no set of circumstances" test "seems plainly inapt" in a challenge to a regulatory definition, preferring to apply the "traditional methods of statutory interpretation" applied by the Fifth Circuit. *Id.* at *17-18 (Thomas, J. dissenting). The majority in *VanDerStok* did not decide otherwise. And notably, the "no set of circumstances" approach the parties discussed appears derived from *United States v. Salerno*, 481 U.S. 739 (1987) (*see id.* at *17), which, like the cases above, involved a constitutional challenge under the Due Process Clause. 481 U.S. at 741, 745.

Indeed, the D.C. Circuit has specifically confirmed that rules—whether regulation or policy—can be vacated through an application-based challenge under the *normal* APA standard for review of agency rules: as exceeding statutory authority or contrary to law. *E.g.*, *CREW II*, 971 F.3d at 350 (because "the Rule conflicts with the FECA's unambiguous terms twice over," the D.C. Circuit upheld district court's vacatur of the rule); *AT&T*, 978 F.2d at 737 (vacating substantive rule upon challenged application); *see also Genuine Parts Co.*, 890 F.3d at 316 ("[A]n

agency's regulations may be attacked … once the statutory limitations period has expired … on the ground that the issuing agency acted in excess of its statutory authority *in promulgating them*.") (emphasis added).

In *NLRB Union*, for example, the D.C. Circuit repeated that "the settled law of this circuit" is that "regulations may be attacked in two ways once the statutory limitations period has expired"—when directly applied to the plaintiff or after a petition for amendment or recission of the rule. 834 F.2d at 195-196. And when a plaintiff challenges "the consistency" of rules "with the statute from which they purportedly derive," and "[i]f Congress' intent is clearly at odds with the regulations, *then they must be struck down,* notwithstanding the [agency's] contrary opinion." *Id.* at 198-199 (emphasis added). So too in *CREW.* The D.C. Circuit there held that, even though the FEC had again dismissed CREW's administrative complaint on remand, which "moot[ed] CREW's claims for relief as to the complaint itself," "CREW's claim under the APA that the rule is invalid as inconsistent with FECA (c)(1) and (c)(2)(C) … remain[ed] live." *Crew II*, 971 F.3d at 347. Finding that "[t]he Rule conflicts with the FECA's unambiguous terms twice over," the court upheld the district court's vacatur of the challenged rule as contrary to the statute. *Id.* at 350, 356. Finally, in *AT&T v. FCC*, the court reiterated that "[w]hen a rule is challenged in its application, courts typically examine the validity of the rule on the basis of the reasoning offered when the rule was originally promulgated." 978 F.2d at 735. The court explained that "[i]t is well established that *a rule* may be reviewed when it is applied in an adjudication—an agency need not explicitly reassess the validity of *a rule* to subject *the rule* to challenge on review." *Id.* at 734 (emphasis added).

As another court in this District recently explained, "the D.C. Circuit has frequently said that a party against whom a rule is applied may, at the time of application, pursue substantive objections to the rule, including claims that an agency lacked the statutory authority to adopt the rule, even where the petitioner had notice and opportunity to bring a direct challenge within

statutory time limits." *Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 39 (D.D.C. 2019). Finding the challenged rules unlawful in that case, the court in *Koi Nation* imposed the usual remedy for such rules—vacating them.

Even assuming that Vanda had to demonstrate that there is literally no permissible way in which the Rules could apply that would stay within FDA's statutory authority—and it surely does not in order to obtain effectual relief at least vacating the Rules as to Vanda—Vanda has done that too. The 60-Day Filing Regulation has no lawful applications; it always adds 60 days onto the statutory 180 days. 21 C.F.R. § 314.101(a)(2) ("The date of filing will be the date 60 days after the date FDA received the NDA."). The Industry Agreement Rule has no lawful scope; FDA cannot rely on a "mutual understanding" between "industry and the agency" to effectuate agreement to extend deadlines on particular applications. *See supra* at 19-24. If FDA wants to rest on actual agreements between specific applicants and FDA, it can do so consistent with the statute— and without any need for a regulation. And the CRL Regulation has no lawful applications; no applicant can obtain an NOOH within the statutory timeframe.

Vanda has demonstrated that FDA's 60-day Filing Regulation, Industry Agreement Rule, and CRL Regulations are irreconcilable with the text of 21 U.S.C. § 355(c)(1). *Supra* at 9-26. The Court should declare unlawful and vacate and set aside FDA's unlawful Rules. 5 U.S.C. § 706(2); 28 U.S.C. § 2201(a).

### 3.    *At a minimum, the Court should issue declaratory relief.*

Vanda has spent the last several years in a perpetual cycle of déjà vu. Each time Vanda submits an application, FDA disregards its statutory obligations and barrels past the FDCA's deadline to review the application. When Vanda comes to court to challenge FDA's delay, the agency points again and again to its unlawful Rules to justify its actions. In these circumstances, declaratory relief is both appropriate and necessary to ensure that Vanda's motion sickness NDA does not face the same fate. The Court can and should declare that FDA may not apply the Rules to

Vanda's pending motion sickness NDA (nor to any of Vanda's other applications[19]) and that FDA's deadline to resolve Vanda's motion-sickness NDA is June 28, 2025.

Vanda and FDA are at loggerheads over the FDCA's meaning and have been for some time. Vanda has insisted that FDA abide the clear deadlines set out in the statute—which FDA has consistently rebuffed. Vanda has had to file several lawsuits in addition to this one related to the agency's delay, resulting in perpetual and largely redundant litigation. *E.g.* Compl., *Vanda Pharms.*, No. 24-cv-351 (D.D.C. Feb. 6, 2024), ECF No. 1 (insomnia sNDA delays); *Vanda Pharms.*, 2024 WL 307387 (jet lag sNDA delays). A declaratory judgment from this Court will finally resolve the recurring dispute between these two parties regarding FDA's statutory obligations to timely act on Vanda's drug applications—and it will ensure that the unlawful Rules do not impede FDA's compliance with the statutory deadline for Vanda's motion-sickness NDA.

Courts recognize that declaratory relief can and should be awarded to settle "ongoing disagreement[s]" (*Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 261 (4th Cir. 2022)) about the legality of an agency's ongoing policy that directly impacts the plaintiff. *See City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1430 (D.C. Cir. 1994) ("[I]f a plaintiff's allegations go not only to a specific agency action, but to an ongoing policy as well, and the plaintiff has standing to challenge the future implementation of that policy, then declaratory relief may be granted if the claim is ripe for review."); *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 325-326 (D.C. Cir. 2009) (when the plaintiff "has proffered unrebutted evidence that it is reasonably likely that the [agency] will not conform to the expedited procedures that … are mandated by Congress," the plaintiff's "request for declaratory judgment falls within the exception to mootness."); *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988) ("[E]ven though a party may

---

[19]    Vanda submitted a new drug application for milsaperidone to treat schizophrenia and bipolar I disorder in adults on February 21, 2025. As with each of Vanda's prior applications, FDA informed Vanda that if the application was considered sufficiently complete to permit a substantive review, FDA would "file" the application on April 22, 2025—sixty days after Vanda actually filed it, ensuring FDA will continue to harm Vanda into the future if relief does not issue.

have obtained relief as to a *specific request* under the FOIA, this will not moot a claim that an agency *policy or practice* will impair the party's lawful access to information in the future.").

Vanda seeks to "settle the question between" Vanda and FDA regarding the meaning of Section 355(c)(1) and its interplay with PDUFA. That FDA also applies its unlawful Rules to other drug companies—or that the relationship between other companies and FDA, including through PDUFA negotiations, might be different from Vanda's—does not undermine Vanda's request for relief. The D.C. Circuit has rejected the notion that "two-party adjudication" is "[un]suitable" to address "the validity of [a rule]" or an agency's general policies merely because others "in the industry have an interest in the question." *AT&T*, 978 F.2d at 732. After all, "nothing [is] stop[ping] the [FDA] from initiating a companion rulemaking" to bring its regulations into compliance with the FDCA alongside, or as a result of, this litigation. *Id.* The Court should therefore, at a minimum, provide Vanda with declaratory relief setting forth its rights. *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."); 5 U.S.C. § 706 ("[T]he reviewing court shall decide all questions of law [and] interpret constitutional and statutory provisions."); *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 81-82 (D.D.C. 2008) (when the court has jurisdiction, a party may seek "a declaration relating to its rights and other legal relations").

Thus, the Court should, in addition to set-aside relief and, at a minimum, declare that FDA's 60-day Filing Regulation (21 C.F.R. § 314.101(a)(2)), the Industry Agreement Rule (73 Fed. Reg. at 39,589; 21 C.F.R. § 314.110(c)), and CRL Regulations (21 C.F.R. §§ 314.100(a), 314.110(b)(3), 314.110(c)) are unlawful and cannot be applied to Vanda's motion-sickness NDA or any other of Vanda's applications and that Section 355(c)(1) requires FDA to act on Vanda's motion-sickness NDA by June 28, 2025—180 days after Vanda filed it.

**CONCLUSION**

The Court should grant Vanda's motion for partial summary judgment as to Counts V and VI of Vanda's first amended complaint and issue an order declaring unlawful and setting aside FDA's 60-Day Filing Regulation (21 C.F.R. § 314.101(a)(2)), the Industry Agreement Rule (73 Fed. Reg. at 39,589; 21 C.F.R. § 314.110(c)), and Complete Response Letter regulations (21 C.F.R. §§ 314.100(a), 314.110(b)(3), 314.110(c)). The Court should further issue declaratory relief that the application of these Rules to Vanda is unlawful, that the Rules cannot be applied to Vanda's NDAs or sNDAs, and that the Section 355(c)(1) deadline to act on Vanda's motion sickness NDA is June 28, 2025.[20]

Dated:  April 9, 2025                    Respectfully submitted,

                                        /s/ *Paul W. Hughes*
                                        Paul W. Hughes (D.C. Bar No. 997235)
                                        Sarah P. Hogarth (D.C. Bar No. 1033884)
                                        Grace Wallack (D.C. Bar. No. 1719385)
                                        MCDERMOTT WILL & EMERY LLP
                                        500 North Capitol Street NW
                                        Washington, DC 20001
                                        (202) 756-8000
                                        phughes@mwe.com

                                        *Attorneys for Plaintiff*
                                        *Vanda Pharmaceuticals Inc.*

---

[20]  Vanda reserves the right to seek injunctive relief compelling unlawfully delayed agency action at an appropriate time. *See* 5 U.S.C. § 706(1).